NELSON MATHEWSON ET AL. v. JOHN W. HOFFMAN AND FRANKLIN DENTLER.

*Waters and water-courses—Prescriptive rights—Diversion of river —Statute of limitations—Bars right to restore to original channel.*

1. The exclusive enjoyment of water in a particular way for 20 years, without interruption, becomes an adverse enjoyment sufficient to raise a presumption of title against a right in any other person which might have been, but was not, asserted.

2. One who has taken the water from the original channel, and has continued to divert and enjoy it for a period beyond the statute of limitation as to real actions, cannot afterwards be permitted to restore it to its original state when it will have the effect to destroy or materially injure the property of those through or by which it formerly flowed. *Belknap v. Trimble,* 3 Paige, 603.

3. An inchoate right of protection from the overflow of lands by water passes by a sale, and the successive owners are in privity with each other. *Leonard v. Leonard,* 7 Allen, 377.

4. While rights in a stream of water may not be lost by mere non-user, they may be by long-continued adverse enjoyment by others. Gould, Waters, § 329.

Appeal from St. Joseph. (Loveridge, J.) Argued June 6, 1889. Decided November 8, 1889.

Bill to enjoin the diversion of a water-course. Defendants appeal. Affirmed. The facts are stated in the opinion.

*H. P. Stewart* and *Dallas Boudeman,* for complainants, contended:

1. The continued diversion of a stream of water for 20 years, or the use of the water in any particular manner for that period, gives the diverter or user an absolute right by prescription to continue such use, the period in which such rights will become absolute being fixed by that allowed for bringing actions to recover real estate; citing Angell, Wat. § 200 *et seq.*; Washb. Eas. §§ 283, 354 *et seq.*, 387 *et seq.*; High, Injunc. (1st ed.) § 507; *Pillsbury v. Moore,* 44 Me. 154; *White v. Chapin,* 12 Allen, 516; *Townsend v. McDonald,* 12 N. Y. 381; *Law v. McDonald,* 9 Hun, 23; *Conklin v. Boyd,*, 46 Mich. 56; *Bunce v. Bidwell,* 43 Id. 542.

2. In such a case the rights must be mutual, and land-owners to whose lands the water had been a detriment gain a corresponding right to have it remain off their land, and to continue to run through the new channel which becomes, as to all persons interested, after said limitation period, the legal channel for the water; citing *Delaney v. Boston,* 2 Har. (Del.) 489; *Middleton v. Gregorie,* 2 Richardson Law (S. C.), 638; *Woodbury v. Short,* 17 Vt. 387; *Belknap v. Trimble,* 3 Paige, 605; *Shepardson v. Perkins,* 58 N. H. 354; *Ford v. Whitlock,* 27 Vt. 265; *Shields*

*v. Arndt,* 4 Green (4 N. S. Eq.), 234; *Norton v. Volentine,* 14 Vt. 239; Gould, Waters, § 340; *Smith v. Adams,* 6 Paige, 441.

3. When a person uses the water of a stream in a particular way, whether by diverting it or fouling it, uninterruptedly for the statutory period, it will be presumed to be under a claim of right and to be adverse, and sufficient to establish a title by prescription, and it is incumbent on the owner of the servient tenement to show that the use was under some license; citing Gould, Waters, § 341; *Hammond v. Zehner,* 21 N. Y. 118; *Law v. McDonald,* 9 Hun, 23; *Melvin v. Prop'rs of Locks, etc.,* 16 Pick. 137; *White v. Loring,* 24 Id. 319; *Hart v. Vose,* 19 Wend. 365; *White v. Chapin,* 12 Allen, 520; *Perrin v. Garfield,* 37 Vt. 310; *Garrett v. Jackson,* 20 Penn. St. 331; *Steffy v. Carpenter,* 37 Id. 41.

4. The right to divert a natural stream may rest upon estoppel, without requiring the length of time to acquire the right by prescription; citing *Jacox v. Clark,* Walk. Ch. 249; *Payne v. Paddock,* Id. 487; Gould, Waters, § 349; and easements of a similar character are recognized by this Court; citing *Conklin v. Boyd,* 46 Mich. 56.

*Howell, Carr & Barnard,* for defendants, contended:

1. The stream and the rights in it being appurtenant to land, can pass only by deed; citing Gould, Waters, § 300; and cannot be lost by abandonment; citing 3 Washb. Real Prop. 61, 66; *Arnold v. Stevens,* 24 Pick. 106, 113, 114; *Townsend v. McDonald,* 12 N. Y. 381; *Day v. Walden,* 46 Mich. 575, 583; Gould, Waters, § 204; Angell, Wat. §§ 243, 249, 252 (note).

2. The statute of limitations does not apply to the case; possibly it fixes a time within which a grant can be presumed; citing *Parker v. Foote,* 19 Wend. 309; *Colvin v. Burnet,* 17 Id. 567; but if the circumstances are inconsistent with the presumption of a grant the court will not presume it; citing *Thorpe v. Corwin,* 20 N. J. L. 312, 316; *Cobb v. Davenport,* 32 Id. 369; *Powell v. Bagg,* 8 Gray, 441; *Tinicum Co. v. Carter,* 100 Am. Dec. 606, 607; *Rhodes v. Whitehead,* 84 Id. 631; Angell, Wat. § 211 (note); 2 Best, Ev. §§ 378–380.

3. As the right claimed depends upon the fiction of a grant, the subject matter must be capable of being conveyed by grant, and if not, or if a grant would be contrary to public policy, the fiction cannot find place; citing Angell, Wat. § 201; Gould, Waters, § 331; *Edson v. Munsell,* 10 Allen, 567; *Burbank v. Fay,* 65 N. Y. 66; *Railway Co. v. Hoag,* 90 Ill. 340; *Rhodes v. Whitehead,* 84 Am. Dec. 631.

4. The right to the natural flow of a stream is a natural right and does not depend upon grant, prescription, or user; citing Gould, Waters, § 204; and although the right to use may be enlarged, modified, or even acquired by prescription, the right to a natural flow is not the subject of grant; citing Gould, Waters, § 205; *Roberts v. Richards*, 50 L. J. Ch. 297; and the land-owner has no property in the water but has only a right to it as it flows; citing Gould, Waters, § 204; *Stein v. Burden*, 65 Am. Dec. 394.

5. The rule is that a prescription can only operate against one who is capable of making a grant; citing Wood, Lim. 379; and the relief of land from the flow of a stream is not subject to grant, and cannot be acquired by prescription; citing *Felton v. Simpson*, 11 Ired. 84; and it has been held that a right by prescription cannot be gained in the flow of surface water unless artificial ditches are constructed; citing Gould, Waters, § 279; *Boyd v. Conklin*, 54 Mich. 583.

6. Assuming, however, that there is nothing in the way of the doctrine of prescription, there must have been an adverse user for the requisite time, and it must have been other than permissive; citing 2 Wash. Real Prop. (5th ed.) 341; Gould, Waters, § 334; *Cobb v. Davenport*, 32 N. J. L. 387; *Yelverton v. Steele*, 40 Mich. 539; *Flora v. Carbean*, 38 N. Y. 111; *Wiseman v. Lucksinger*, 84 Id. 43; and the proof of it must be clear and cogent; citing *Yelverton v. Steele*, 40 Mich. 538; *Marble v. Price*, 54 Id. 466; and the holder must have believed in his title; citing *Campau v. Lafferty*, 43 Mich. 429; and the occupancy must have been such that it is difficult or impossible to account for it except upon the presumption of a grant; citing *Brace v. Yale*, 10 Allen, 441; *Vliet v. Sherwood*, 35 Wis. 229; *Water Co. v. Water Co.*, 64 Cal. 185; and it must have been constant as to extent, manner, and quantity; citing 2 Washb. Real Prop. (5th ed.) 343; Gould, Waters, §§ 342, 343; and it must have been peaceable; citing *Sargent v. Ballard*, 9 Pick. 251; *Arnold v. Stevens*, 24 Id. 110; *Ward v. Warren*, 82 N. Y. 256; *Colvin v. Burnet*, 17 Wend. 568.

LONG, J. The bill in this cause is filed by ten complainants against defendants, Dentler and Hoffman, to perpetually enjoin them from removing a certain dam, and thus cause the waters held back by the dam to flow across the farming lands of complainants.

The bill alleges, substantially, that the complainants

are severally the owners of certain parcels of real estate particularly described in the bill of complaint, and situated in the township of Mendon, St. Joseph county, and State of Michigan, and at the time of commencement of this suit were occupying, respectively, the premises so owned by them.

That prior to the year 1844 a natural and perpetual stream of water, called the "Little Portage River," crossed from an easterly direction over the parcels of land owned by them, and emptied into the "Big Portage River," so called, on section 24, in Park township, which was a point westerly of the lands owned by the complainants; that on the margin of said stream, and across the several parcels of land now owned by the complainants, was a large amount of bottom-land, which, while the stream ran through it, was wet and cold by reason of the waters of the streams flowing over and percolating through such bottom-lands, and thereby said bottom-lands were made worthless, and could not be made valuable for farming or any other purpose, and that no crops could be raised thereon by reason of the waters so percolating through and flowing on said lands; and, by reason of said wet lowlands along said stream, the public health, and especially the health of the persons living near the same, was detrimentally affected.

That about 1844 one Elisha Doane caused to be dug a race from the Little Portage river to the St. Joseph river,—the St. Joseph river lying one mile south of where the race intersected the Little Portage river,—and this point of intersection was east and up the stream from the lands now owned by the complainants; that after Doane had dug the race he constructed a dam across the Little Portage river at a point where the race intersected it, and stopped the flow of the water of the Little Portage river in its original channel, and diverted the waters of the stream

into the artificial channel dug by him; that this diver-
sion of the waters of the Little Portage river was made
by Doane for the purpose of creating a water-power at
the village of Mendon, through which it passed; that
after the diversion Doane constructed a dam near the St.
Joseph river, and took the waters of the Little Portage
river through the race, as above stated, and made a
water-power at this point, and on the water-power mills
were built, amongst others, a flouring-mill, and this, with
other machinery, was operated uninterruptedly from 1844
to 1882, when the dam broke away, and has not since
been rebuilt; but that the water continued to be diverted
from the Little Portage river down through the old race
and through the old mill-pond ever since 1844, and still
continues.

That Doane, and those claiming under him, continued,
from a period since 1844 to the present time, to occupy,
use, and divert the water from the Little Portage river,
and have continually diverted it through said race, and
thereby removed it from flowing across said lands owned
by the complainants, and it has not flowed across the
same for a period of about 43 years prior to the time of
filing the bill of complaint; that the diversion of the
water of the Little Portage river by said Doane, and
those claiming under him, continued peaceably and unin-
terruptedly, and by the tacit consent of all the parties
interested, for more than 40 years last passed; and that,
by the long, peaceable, and uninterrupted diversion of
said stream of water from flowing across the lands owned
by the complainants, their lands have become, and are
now, freed, relieved, and unincumbered in law from the
flowing of the waters of said stream across said lands;
and any and all rights of any other persons, which might
otherwise have existed, to have the stream of water flow
across said lands have become barred, concluded, and

estopped by reason of the great length of time during which said diversion has continued.

That complainants became the owners of their several parcels of land since the diversion of the water of the Little Portage river, and they purchased their lands knowing that no stream of water incumbered them, and believing that said stream of water would remain diverted in the same manner that it has been so long diverted; that by reason of the diversion of said stream of water from their said lands the low bottom-lands adjoining the original bed of the stream have become dry, and in a good condition for cultivation; that complainants have been to a considerable labor and expense in preparing and fitting said lowlands upon said respective premises for cultivation, and that they are now, and for years have been, cultivating a considerable portion of the same, raising crops thereon, and such lands have now become the most valued portion of their farming lands; and that while, with the water on, they were worthless, they are now worth $50 per acre and upwards, and the amount of such lands aggregate about 380 to 400 acres; that all of their said lands are similarly located to the old channel of the Little Portage river, and would be similarly affected by the return of the water of the stream to the old channel; that they, and those under whom they claim, have uninterruptedly, and for more than forty years last past, enjoyed and occupied their respective parcels of land freed and unincumbered of the waters of said river

That since the diversion of the waters of the Little Portage river, at a point known as "Parkville," about one mile below the point where the Little Portage river originally emptied into the Big Portage, a dam and water-power has been erected, and on this water-power several years ago was erected a flouring-mill, and which

since has been operated, and the same is now being operated, by Franklin Dentler, one of the defendants. That since the diversion of said Little Portage a dam and water-power were erected across the Big Portage river about eight miles below the Parkville water-power, and a flouring-mill was erected on that, and the same is being used by the defendant John W. Hoffman.

That said Dentler and Hoffman, defendants, have recently conceived a scheme of diverting the water of the Little Portage river from and out of the channel through which it has so long flowed, as above stated, and to turn back the stream of water again into the old abandoned channel, upon and across the lands of complainants; that defendants, just before the filing of the bill of complaint in this cause, had notified complainants that they proposed to turn the waters back into the old channel, as above stated; that the defendants insisted that they had the right to turn the same back, and to use the water for their water-powers, and they threatened to do so, and would do so, unless they were restrained by injunction.

Complainants further state that the turning of the waters of said stream into the original channel is threatened by defendants, and if done that it will result in irreparable injury to them; that if the waters are so caused to flow in the old channel, across said lands, the same would cause the bottom-lands belonging to complainants to become wet and cold, and render them worthless for farming purposes, and they would be valueless for any purpose; that the crops growing upon said lands would be destroyed, and complainants would be deprived of the use and value of said bottom-lands, and each would be damaged more than $100; that the lands adjoining are low, and the flow of water is but slight, and as a result the lands would be wet and overflowed by the precolation

of the water; that, during the time the old channel has not been used, vegetable matter has accumulated and grown up thereon, and to return the water into the old channel again would result detrimentally to the public health, and especially to the health of the complainants, who reside near the old channel; that the air would thereby be filled with malaria and poisonous gases and foul odors, and complainants' health and comfort thereby detrimentally affected, and that this would continue from year to year, while said waters were so allowed to flow.

The bill alleges that the acts threatened by the defendants are unlawful, and against the complainants' rights, and detrimental to the public health generally, and especially to the health of complainants, who live so near the lands thus to be affected.

The prayer of the bill is that the defendants be required to answer the bill, but not under oath, and that it be decreed that the complainants' lands above described be freed and unincumbered of and from the waters of the Little Portage river, and that the same cannot be caused to flow in said old channel, across complainants' lands, by the defendants, and that the complainants' lands are freed from any servitude of the waters of said Little Portage river that now flow in the above-mentioned race; that the defendants be perpetually enjoined and restrained from diverting the flow of the water from the Little Portage river, now flowing through the artificial channel, and from causing the same to flow across complainants' lands through the original bed of the stream, and from causing any of the waters whatsoever to flow on and across the lands of the complainants; and they also pray for general relief in the usual form.

On filing the bill a temporary injunction was issued December 30, 1887.

The answer leaves the complainants to prove the title

of the lands claimed by them, and the character and qual-
ity of the bottom-lands; admits the existence of the Lit-
tle Portage river; does not deny the diversion of the
stream, but says, if the race was dug, it did not obstruct
the further flow of the water; and denies that all the
water was so diverted; and denies that the diversion was
continuous.   Defendants also deny that the complainants'
lands are freed from the incumbrance, admit the erection
of the defendants' mills, and that they have always claimed
the water.   The answer also admits that they purpose
closing up the race and restoring the water to the old
channel, but denies that it will injure complainants' lands
or the public health.

By the answer, more fully stated, it is claimed by
defendant Franklin Dentler that the flouring-mill at
Parkville has been operated by him for several years; that
it is erected along what is called the "Big Portage,"
below the point where the Little Portage enters it, and
he claims, and always has claimed, that he is legally
entitled to the flow of the water of the Little Portage
river, in place of a portion of it which is diverted and
cut off by the said race.

Defendant Hoffman, for himself, says that a flouring-
mill has for several years last past been operated by him
on the Big Portage river, several miles below Parkville,
and he claims, and always has claimed, the flow of the
water for said mill, instead of a portion of it so originally
cut off by the digging of said race.

And the defendants, further answering, say that, being
the owners by purchase of Adams Wakeman of the waters
of the Little Portage river at Mendon, and of the lands
through which said race is cut, and all franchises and
riparian rights of said Wakeman, who was the sole owner
of the same at the time of such purchase, they have con-
ceived the idea that they have the right, and propose, to

return so much of the waters of the Little Portage river back into, the original channel which were so wrongfully, unjustly, and injuriously taken from them to the mill owners who own any part of the waters of the Little Portage river; which purchase from Adams Wakeman was made a short time ago, and for the purpose of preventing further litigation. And they further say that, by the purchase of said lands, franchises, and riparian rights of Adams Wakeman, they are entitled to the use of the water so wrongfully diverted, as they claim, and to return said waters to the original channel, whatever its effect may be upon the lands of complainants; and that complainants knew that these lands were subject to the rights and flow of said waters.

On the hearing in the court below, a decree was entered granting a perpetual injunction, according to the prayer of the bill. Defendants appeal.

It is claimed on the part of the complainants that the evidence on their part establishes beyond all controversy the following propositions:

1. The ownership of the lands described in the bill by the respective parties, and that they have owned and occupied them for many years; that the homes of all of them are situated near the bottom-lands involved in the case; and that the complainants, and those under whom they claim, have owned and occupied these lands in the neighborhood of 40 years, continuously.

2. It is shown beyond all question that prior to 1844, while the water was flowing through the lowlands adjoining the stream of the Little Portage, all the lands adjoining such stream were impregnated and soaked with water to such an extent that they were substantially valueless; that nothing could be raised upon them; that the soil was of such a nature that water passed easily and freely through it; that a goodly portion of the land was covered with wild flags; and that the only thing ever obtained from it while the stream flowed through it was the ordinary wild or marsh grass, of very little value for any purpose, and often it became necessary to carry this off,

because the water prevented driving teams upon the land to get it.    The land, in its original state, was substantially a waste.

3. The fact is also proven, without contradiction, that about 1844 the water of the Little Portage was turned at a point north of Mendon village, and caused to run through an artificial channel dug by Mr. Elisha Doane, and, after being so turned, it was dammed up before it reached the St. Joseph river, thus forming a water-power, on which were located, and for many years were operated, mills of various kinds, such as carding-mills, turning lathes, saw-mills, planing-mills, chair factories, and grist-mills.

4. It is shown by a great amount of testimony that after this diversion the flow of the stream at an ordinary stage of water was substantially all through the artificial channel.    During times of freshets, and when more than the ordinary water was coming down the stream, the water would overflow all the lowlands, including those of complainants, but these freshets were of short duration, and usually in the spring and fall, and these still continue in the same manner as formerly; but this did not and does not interfere with the complainants in the cultivation of their lands.

5. The diversion of the water from these lands had a very beneficial effect upon them.    The creek bottom was composed of the decayed vegetable matter usual along the streams of this State.    Water passed quickly through it, and so long as the stream had passed through the channel the soil remained saturated with water to such an extent that nothing of value could be grown upon it. When the water was removed all of this was changed. The lands soon became dry.    The owners of it, at considerable expense to themselves, cleared it up of such underbrush and obstructions as were on it, and the result was that it became not only good farming lands, but in fact the best in that portion of the country.    Better crops were raised upon it than upon any of the upland; and this, in a section of the country that cannot be excelled in the State in fertility of its soil.

We think these propositions are fully established by the evidence.    Under the facts so established, the claim of the complainants is that they are entitled to the use

of their lands, freed from this incumbrance, on either one of three theories:

1. That there has been a grant and agreement by and between the lower proprietors and the person digging the race that he should take the water off these lands and keep it off.

2. That they have gained the prescriptive right to have the water kept off their land by the undisputed and uninterrupted use of the land free from the water for the period required by law for that purpose.

3. That they have continued to occupy the lands freed from the water for such a length of time as that they are now protected in their use by the statute of limitations and adverse possession and user, and that defendants have no longer the right to dispossess them of any part of their lands for the purpose of running the water across them.

We are satisfied from the evidence that all three of these propositions are sustained, and that defendants have now no right to take down the dam, and cause the waters of the Little Portage river to flow across complainants' lands.

Prior to 1844, and perhaps for a period less than 20 years thereafter, the complainants and their grantors had the right to the flow of those waters through their natural channel, which was across their lands, and making their way into the Big Portage. During that year this dam was erected, and has been kept and maintained ever since, causing all these waters, except during the spring and fall freshets, to flow through an artificial channel, then cut from the stream above complainants' lands, to and through the village of Mendon, and the waters flowing thence into the St. Joseph river. These waters, so diverted from the natural bed of the stream, have been used by the defendants and their grantors from that time until the present, and the diversion has been continuous, exclusive, and adverse to the complainants, and all the

land-owners below where the dam was erected to the Big Portage.

Defendants make some claim that the proofs show an interruption of the use of the waters during some period of this time, that the dam was not constantly maintained, and that a portion of the waters were tnus permitted to flow down the channel of the old stream. We find no evidence in the record that would warrant the assumption that the dam was out for any length of time, or that the parties using the waters for mill purposes at the village of Mendon ever abandoned its use, or assented to have it carried back into the old channel. This use has been continuous, open, and notorious, and the defendants and their grantors have had the exclusive use and enjoyment of these waters ever since the erection of this dam, so far as the complainants are concerned, and such use has been adverse to the complainants. ' During all this time the complainants, as well as all others who might have an interest in the use of these waters below the dam, have acquiesced, so far as shown by this record, in the use made by the parties diverting and using it. Nothing more is requisite to establish the right, at least, of the parties who have so long continued its use.

If complainants had filed their bill to remove the dam, and claimed the right to have the waters flow again through the old channel, under the facts proven in this case, such claim must have been denied, for the facts show a prescriptive right in the defendants to have the waters continue to flow through the channel made in 1844. The rights of the complainants and their grantors in these waters were cut off when the dam was first constructed, and the computation of time begins when the injury or invasion of the owner's rights begins. The use by the defendants and their grantors being continuous,

77 MICH.—28.

exclusive, and adverse, and the complainants having acquiesced, such use and enjoyment would ripen into a right after the lapse of 20 years. It follows that these rights and duties must be reciprocal. If complainants could not compel the return of the waters into the old channel, and defendants' use had ripened into a right to have the waters carried through the artificial channel made in 1884, by what reasoning can it be claimed that the defendants may, as a matter of right, compel the complainants to again receive the waters through its original channel, and permit it to flow across their farms? The defendants must stand in the shoes of their grantors, having no other or greater rights, so far as the property through which the waters now flow is concerned; and their right to have the water carried again into the Big Portage, to be used by them for milling purposes, is no greater than their grantors' to that property, all of whom have acquiesced in the use made of the water at Mendon.

The complainants also have the same right of protection from the overflow of their lands by this water as their grantors. Such inchoate right passes by a sale, and the successive owners are in privity with each other. *Leonard v. Leonard,* 7 Allen, 277.

The complainants and their grantors, for more than 45 years, have enjoyed their estates freed from these waters, and they cannot now be compelled to receive them. The defendants have no more right, under the circumstances, to change the water from the artificial channel back into the original channel than they would to turn it into any other channel, or across the land of any other person. The new channel has become the channel of the stream.

The exclusive enjoyment of water in a particular way for 20 years, without interruption, becomes an adverse

enjoyment sufficient to raise presumption of title against a right in any other person which might have been, but was not, asserted. This rule must be reciprocal, and one who has taken the water from the original channel, and has continued to divert and enjoy it for a period beyond the statute of limitation as to real actions cannot afterwards be permitted to restore it to its original state when it will have the effect to destroy or materially injure the property of those through or by which it formerly flowed. *Belknap v. Trimble,* 3 Paige, 605.

Defendants' counsel contend that rights in a stream of water cannot be lost by mere abandonment. It is true that rights may not be lost by mere non-user, but such rights may be lost by long-continued adverse enjoyment by others. Gould, Waters, § 329.

Defendants' counsel also contend that this is a navigable stream, within the ruling of this Court in *Moore v. Sanborne,* 2 Mich. 519; *Rice v. Ruddiman,* 10 Id. 140; *Thunder Bay River Booming Co. v. Speechly,* 31 Id. 336,—and that the public have rights therein, and therefore the doctrine of prescription is not applicable. The stream itself does not bear evidences of navigability, within the ruling of these cases, and the defense, under the pleadings and proofs taken in the case, is not rested upon any such claim.

The defendants claim the right to turn the stream back into the old channel for their own private use, and because they have acquired all the rights of Adams Wakeman at Mendon. The case need not be discussed at greater length, as we are satisfied, from the whole record, that the complainants are entitled to the relief prayed.

The decree of the court below was in accordance with the prayer of the bill, and must be, affirmed, with costs.

The other Justices concurred.