SMITH and others, Respondents, vs. YOUMANS and others,
Appellants.

*April 7 — April 30, 1897.*

| 96 | 103 |
| 101 | 493 |
| 96 | 103 |
| f103 | 275 |
| 103 | 277 |
| 96 | 103 |
| 113 | 1351 |
| 96 | 103 |
| 114 | 155 |
| s37 LRA | 285 |
| 54 LRA | 479 |

*Waters: Mill-dams: Raising of waters in lake: Right of riparian owners
to have artificial level maintained: Abandonment of easement: Land-
lord and tenant.*

1. Where the owner of a mill-dam at the outlet of a lake has, for a
length of time sufficient to give him a prescriptive right, main-
tained the waters of the lake at such a height that they have cov-
ered the low marshy shores and extended to the high banks,
thereby rendering the adjacent lands desirable for use as summer
resorts, the riparian owners, who have for the same period enjoyed
the advantages of such artificial level of the waters and in reliance
upon its maintenance have improved their property at great ex-
pense for the use mentioned, have on their part an easement to
have the waters kept at said higher level and may prevent the
lowering thereof to their injury by the owner of the dam,— at
least so long as he does not abandon or surrender his easement to
flood the lands.

Smith and others vs. Youmans and others.

[2. *It would seem* that the owner of the dam in such a case may abandon his easement of flowage so as to escape all liability *at law* for consequential damages to the owners of the flooded lands by reason of the lowering of the level of the lake, unless he is bound by law or agreement to maintain the higher level of the waters in the lake.]

3. The lessee of a dam at the outlet of a lake, who is also the proprietor of another dam lower down on the stream, has no other or greater rights than his lessor in respect to lowering the level of the waters of the lake.

Appeal from a judgment of the circuit court for Walworth county: FRANK M. FISH, Circuit Judge. *Affirmed.*

This is an action to restrain the defendants from in any way or manner drawing down or lowering the water in Lake Beulah, so called, and is brought by a large number of riparian proprietors on and along the waters of said lake against the owners and lessee of a certain dam at or near the outlet, whereby the waters of the lake were raised to a sufficient level to create a water power for milling purposes. Upon a trial of the issues joined the following facts were found, in substance:

Lake Beulah, as it now exists, originally consisted of two meandered lakes, which were separated by a strip of marsh about eighty rods wide, through which ran a small stream. The outlet of the more northerly of the lakes was by a small stream called Beulah river, which runs northerly and then easterly until it empties into Mukwanago creek, and said creek runs into Fox river. In 1838 a dam was built across the outlet of said lake at about the point where it left the lake, and the waters of the lake were raised a few feet, creating power for a saw-mill erected at the dam. After 1846, and before 1852, the original outlet was closed by an embankment, and has ever since so remained, and an artificial outlet to said lakes was created, at which point another dam was created, raising the waters in said lake to the height of six feet above their natural level, and eighteen inches higher

than by the former dam, creating a body of water known as Mill lake, and a new and artificial outlet for the said lakes, so that their waters, after passing over such dam, flowed by a new channel into said Beulah river, and in consequence of such dam the waters of the said two lakes were so raised as to flood to a considerable depth the marsh land formerly separating them, and making of them one body of water upwards of three miles in length, and varying in width from a quarter of a mile to one mile and a quarter, with an area of about 900 acres. All these changes were made by Ball & Mower, the remote grantors of H. A. Youmans, under and through whom the defendants claim their rights and interests; and Ball & Mower built upon a site near said dam a grist mill, which was used and operated by the power thus provided until it was destroyed by fire in 1876. The owners of the said dam and mill site at all times thereafter until shortly before the commencement of this action maintained the level of the water in said lakes at the point to which it was raised by said dam, save only as it was raised by freshets or unusual rains, or was lowered, as hereinafter stated, by draft of water through the said dam for use at said mill.

By the construction and maintenance of said dam and such consequent raising of the level of waters in said lakes, portions of the lands owned by certain of the plaintiffs and the grantors of certain others of them were flowed and submerged by such dam owners continuously, adversely, and uninterruptedly, and notoriously, exclusively of any other right, under claim of right for more than forty years, and at all times during that period the said level to which the waters were so raised by said dam was substantially and constantly maintained; so that said Youmans and his said grantors and his heirs and devisees acquired a right by prescription to so flow said lands, both as against the owners of lands bordering on said lakes and as against riparian owners below said lands. One effect of the construction of said

Smith and others vs. Youmans and others.

artificial outlet, and the diversion thereto of the natural flow
of the waters of said lakes, and the construction and main-
tenance of said dam and embankment, was to deepen the
waters of the lakes, and set said waters up and back against
the hard and higher banks, and to make said lakes naviga-
ble for row boats, small sail boats, and steam launches, and
to make the banks eligible and desirable sites for summer
cottages and summer resorts, and to make said lakes a de-
sirable place for fishing, boating, and recreation, and to make
the margin of the lake touch the grassy banks and submerge
the boggy and marshy shores, as they before existed, and to
render the banks readily accessible by small row and pleas-
ure boats.

About the year 1888, and from time to time thereafter,
sundry of the plaintiffs, relying upon said conditions and the
level of the lake as then existing and as having so uniformly
existed for more than forty years, built summer homes for
themselves and families, or summer resorts for recreation,
and purchased divers lots and parcels of land fronting and
bounded on said lakes for that purpose, and made divers
and sundry valuable improvements on said lots to that end,
as did many other persons. Certain other plaintiffs named
owned lots and lands bounded by said lakes, and had owned
the same from an early day. Said lands, for agricultural
purposes, were worth not more than $50 per acre, but for
the purposes aforesaid, with the level of said lakes as thus
maintained, were worth from $1,000 to $2,000 per acre.

The dam belonging to the defendants *Youmans*, *Haight*,
and *West* consists of an embankment of earth, with two
openings, one for a flume and the other for a waste weir,
and are planked on the bottom and sides, and after the de-
struction of the mill, and until a short time before the action
was brought, were kept closed by bulkheads, backed up with
gravel; and after the destruction of the mill in 1876 the
power created by the dam had not been used. The defend-

ant *John Howitt* is, and for many years has been, the owner
of a grist mill at Mukwanago, upon a stream into which
said Beulah river empties, about five miles below said dam,
which is, and for forty years past has been, driven by water
power created by a dam across the said stream; and said
*Howitt*, September 16, 1891, took from H. A. Youmans, then
the owner of the dam and mill site at the foot of said lakes,
a lease of the water power and water rights there created,
and which still remained in force, and by it he was to ex-
pend a certain sum annually on the dam, flumes, and weirs
of said water power, and was to do certain other work
thereon.

If the bulkheads were to be removed, and the water
allowed to run freely through said dam, the level of the
water in Beulah lake would be drawn down to a point over
three feet below the lowest point to which the water was
drawn in the operation of the mill formerly there main-
tained; and, if the dam should be removed, the said waters
would fall to a point four feet further. The lowest point to
which the waters were drawn or could be drawn consistent
with the operation of said mill, was a point thirty-three
inches above the floor of the flume where said bulkhead
crosses the same in the western opening in said dam; and
the waters of the lake were continuously maintained at that
point, until the defendants took out the bulkheads, a short
time before this action was commenced, and drew down the
waters of the lake to the level of the floor of said flume, to
the great injury of the plaintiffs. Lowering the waters of
said lake will substantially impair the value and availability
of the parcels and lots of land owned by the plaintiffs and
bounded on the lake; the waters will recede from its banks,
and in almost all places strips of slimy, boggy, and marshy
shore will be uncovered, preventing access by boats to the
plaintiffs' piers, and will substantially impair, and well-nigh
destroy, the beauty of the lake, and its adaptation and avail-

ability for summer residences and summer resorts, and make the vicinity unhealthful, and render the plaintiffs' improvements practically valueless for the purposes for which they were constructed.

Shortly before the action was commenced, said bulkheads were replaced to the height of two feet or more, and so that the waters of the lake rose and overflowed the bulkheads.

The plaintiffs asked judgment that the defendants, their agents, etc., be perpetually restrained from in any way raising, taking out, or removing from the said dam any of the bulkheads or waste or flash boards in or on the same, and from in any way throwing down, lowering, or opening the dam, and from in any way interfering with or drawing down the water in Lake Beulah. The defendants insisted upon their right to use and withdraw the waters of said lakes according to their needs and discretion. Judgment was given perpetually restraining the defendants, their agents, etc., from doing any of the acts mentioned so as to permit or allow the flow of water from the lake at a level below the point named, thirty-three inches above the floor in the flume, etc., and for costs; from which the defendants appealed.

For the appellant *Howitt* there was a brief by *Ryan & Merton;* for the other appellants there was a brief by *T. W. Haight;* and the cause was argued orally by *Mr. Haight* and *Mr. T. E. Ryan.*

For the respondents there was a brief signed by *Chas. Quarles,* of counsel, and *Quarles, Spence & Quarles* and *D. S. Tullar,* attorneys, and oral argument by *Mr. Tullar* and *Mr. Chas. Quarles.*

PINNEY, J.    It clearly appears that H. A. Youmans, the lessor of the defendant *Howitt,* and ancestor through whom the other defendants derived their rights to the mill power and water rights and privileges in question, acquired a right by prescription, or an easement, to maintain the waters of

Lake Beulah at the level to which they were finally raised, and at which they had been maintained for a period of over forty years, and consequently to set the waters of the lake back against and over and upon the lands of the riparian proprietors, the plaintiffs and others, on the lake, for the purpose of creating and maintaining the necessary power for propelling a grist mill. His mill site, dam, and appurtenances constituted the dominant estate, and the right which he acquired was an easement in the one estate, and a servitude upon the estates of other riparian owners. Washb. Easements, 5. It seems to be a fair inference that such riparian owners, in view of the advantages that might or would accrue to them by raising the level of the waters of the lake by the dam in question, were induced to consent or acquiesce therein, and in the user of the dam and waters of the lake by Youmans and his predecessor in interest until their acts had ripened into an easement by prescription. The relative relations and interests of the parties which have thus originated, grown up, and become fixed by prescription, would seem to impose upon the parties reciprocal rights and duties, at least to the extent that, so long as such relative rights exist and are asserted, each party is bound in equity to abstain from doing anything to the prejudice of the other's rights, founded upon the relations thus created between them, and that they are equitably bound to deal fairly, reasonably, and justly with each other in respect thereto.

It has long been settled that the artificial state or condition of *flowing* water, founded upon prescription, becomes a substitute for the natural condition previously existing, and from which a right arises on the part of those interested to have the new condition maintained. The watercourse, though artificial, may have originated under such circumstances as to give rise to all the rights that riparian proprietors have in a natural and permanent stream, or have been so long used as to become a natural watercourse prescriptively; and

" when a riparian owner has diverted the water into an artificial channel, and continued such change for more than twenty years, he cannot restore it to its natural channel, to the injury of other proprietors along such channel, who have erected works or cultivated their lands with reference to the changed condition of the stream, or to the injury of those upon the artificial watercourse who have acquired by long user the right to enjoy the water there flowing." Gould, Waters, § 225, and cases there cited. It is upon this ground that when the natural outlet of Lake Beulah was closed, and so remained for over twenty years, the artificial outlet at that time opened, and since maintained during that period, became the natural outlet, with all its legal incidents and consequences. In *Belknap v. Trimble,* 3 Paige, 577, 605, it was held " that the rule must be reciprocal; that the proprietor of land at the head of a stream, who changes the natural flow of water, and has continued such change for twenty years, cannot afterwards be permitted to restore the flow of water to its natural state, when it will have the effect to destroy the mills of other proprietors, which have been erected in reference to such change in the natural flow of the stream." Washb. Easements, *313–315. In *Mathewson v. Hoffman,* 77 Mich. 421, 434, the rule thus stated in *Belknap v. Trimble, supra,* was approved. *Lampman v. Milks,* 21 N. Y. 505; *Roberts v. Roberts,* 55 N. Y. 275. It is also supported by *Delaney v. Boston,* 2 Har. (Del.), 489–491; *Middleton v. Gregorie,* 2 Rich. Law, 631–637. In Washb. Easements, *313–315, the learned author lays it down that " where one who owns a watercourse in which another is interested, or by the use of which another is affected, does, or suffers acts to be done, affecting the rights of other proprietors, whereby a state of things is created which he cannot change without materially injuring another who has been led to act by what he himself had done or permitted, the courts often apply the doctrine of estoppel; and equity,

and sometimes law, will interpose to prevent his causing such change to be made." In *Woodbury v. Short*, 17 Vt. 387, it was held that, where a diversion of the stream affects other proprietors favorably, and the party on whose land the diversion is made acquiesces in the stream running in the new channel for so long a time that new rights may be presumed to have accrued, or have accrued, in faith of the new state of the stream, the party is bound by said acquiescence, and cannot return the stream to the former channel. *Ford v. Whitlock*, 27 Vt. 265; *Norton v. Volentine*, 14 Vt. 246.

These cases relate, it is true, to diversions of water in *running* streams, but we are unable to perceive any reason why the same principle is not equally applicable to changes made in the level of a lake or pond, where, by means of a dam, the natural level has been raised for hydraulic purposes. The maintenance of the higher level of waters in the lake for the period of prescription secured to the owners of the mill site an easement in their favor to keep up the water to the necessary level to furnish water power for their mill. So, on the other hand, the riparian owners above have enjoyed, without question or interruption, for the same period of time, the advantages resulting from the flooding and submersion of their lands, by which the depth of water in the lake was greatly increased, and low, boggy, swampy, and unsightly lands were flooded, so that the waters extended to the high banks, whereby their access to and from the lake was improved, and the adjacent lands, with the resulting amenities and advantages, have been rendered extremely desirable for the particular use for which they have been improved at great cost and expense, namely, for summer resorts, relying upon the continued level of the water in the lake without change, without which they would be deprived of the greater portion of their present value. May it not be justly said that the respective tenements or estates, by the acts of their respective owners, have become each dominant, and each

servient to the other in respect to the respective easements
and advantages thus acquired by them, and enjoyed during
the usual prescriptive period?

In the case of *Cedar Lake Hotel Co. v. Cedar Creek Hy-
draulic Co.* 79 Wis. 297, this court held that one who owns
land on the shores of an inland lake, which is valuable for
use as a pleasure resort on account of its proximity thereto
and the easy access to its waters for boating and fishing, can
maintain an action to restrain other riparian proprietors from
so drawing off the waters of the lake as to lower its level, and
leave a wide margin of bog, covered with decaying vegeta-
tion along its shores, making it repulsive in appearance and
unhealthy in effect, and thus injurious to the plaintiff's prop-
erty; and this was so held in view of the relative rights and
duties of the riparian proprietors, and not because of the re-
strictive grant of power to the corporation, one of the defend-
ants.    It is true that this was held in relation to an attempted
change in the *natural* level of Cedar lake, but the conclu-
sion seems irresistible that the increased level of the lake, in
view of the facts found, by parity of reasoning from the ad-
judged cases referred to in relation to streams, must be es-
teemed as having the legal incidents of the natural level;
certainly so long as the defendants *retain and insist upon
their easement* to keep and maintain the dam at a height to
keep up such new level in the lake. .They have not and do
not propose to abandon or surrender this easement.    They
are certainly bound to exercise their rights in a fair and
reasonable manner, and as they had been accustomed to do,
and not capriciously or wantonly, so as to prejudice the exist-
ing rights and interests of the plaintiffs as riparian owners.
The judgment of the circuit court is in accordance, we think,
with sound principles, and the doctrines recognized and en-
forced in such and similar cases in courts of equity.

We have no doubt but that the defendants may abandon
their water rights and easement, so as to escape all liability

Smith and others vs. Youmans and others.

*at law* for consequent damages, if they are not bound by law or agreement to maintain the higher level of the waters in the lake. It was held in *Mason v. S. & H. R. Co.* L. R. 6 Q. B. 578, that the owners of the servient estate could acquire, by the *mere* existence of the easement, no right, as against the owner of the dominant tenement, to the continuance of its use and exercise, as in the case of an easement for diversion of water; that he had the right to abandon the exercise and use of his easement, as it was not compulsory. But here, as stated, there has been no abandonment or surrender, and the case must be determined upon the *equitable* grounds arising out of the special facts found by the trial court.

2. As to the defendant *Howitt*, it is necessary only to observe that he stands, in respect to his lease, in the same plight and condition of his lessor, and with no other or greater rights. He has no right, under the lease, to use the dam, bulkhead, etc., as a reservoir to accumulate water in a manner not permissible to his lessor, or to accumulate and hold water for his mill on the stream below, in order to discharge it irregularly and in great volumes, as may suit his convenience, thus drawing down wholly, or in great part, the waters of the lake to the level of the flume. As a riparian owner on Mukwanago creek below, he has no such right, but is entitled only to the accustomed flow of the water as it had been wont to run, without material alteration or diminution, to his mill on the stream below (*Kimberly & Clark Co. v. Hewitt,* 79 Wis. 334), all of which he obtains by the flow of the water over the dam or waste gates.

For these reasons we think that the judgment of the circuit court is correct.

*By the Court.*— The judgment of the circuit court is affirmed.