PHILIP H. KRAY v. ANTON MUGGLI and Others.

July 3, 1899.

Nos. 11,699—(204).

**Removal of Dam—Prescriptive Right of Riparian Owners—Injunction.**

A milldam was constructed across a small river in such a manner as to create a vast reservoir of water in the river, and in a chain of lakes through which the river runs, thereby flooding a large area of lowlands. After the dam was maintained for 41 years, and the mill owner had acquired a prescriptive right to maintain it, he sold to the owners of certain of the flooded lands the right to destroy the dam and reclaim their flooded lands. In an action brought by another riparian owner to enjoin the removal of the dam or the lowering of the stage of water thereby maintained, *held*, the dam being of a perishable character, and the mill owner being liable for negligence in maintaining it, if not an insurer of its safety as to all persons who may be injured by the bursting of the reservoir, the conditions continue always to be of an artificial character, the reservoir does not become, by lapse of time, analogous to a natural lake or water course, and the riparian owners have not acquired a reciprocal prescriptive right to have the dam maintained for their benefit after the mill owner has abandoned it for the purposes of water power.

**Same—Equitable Estoppel.**

*Held*, further, even in such a case, the riparian owners may, by equitable estoppel, acquire the right to maintain the dam or have it maintained, but in such a case their equities must be strong and substantial. In this case their equities are not of that character, and there are strong counter equities in defendants which defeat the claims of the plaintiff.

Action in the district court for Stearns county to enjoin defendants from removing a milldam. The case was tried before Searle, J., who found in favor of plaintiff; and from a judgment entered pursuant to the findings, defendants appealed. Reversed.

*G. W. Stewart*, for appellants.

Plaintiff did not possess and could not acquire any rights by pre-

scription. The dam owners are not estopped from removing the dam. The cases in which estoppel has been applied are cases where there was a change in the condition of the water course, which had been acquiesced in from its inception by all parties in interest, and where to permit the change would have been inequitable and destructive of valuable property rights. In none of these cases did the owner of the dominant estate seek to abandon the prescriptive right which he had in the waters. What he did seek was to change the manner of the user to the great loss of many and to little benefit to himself. Plaintiff's rights of navigation are not threatened. A stream that can be made floatable only by artificial means cannot be deemed a public highway. Moore v. Sanborne, 2 Mich. 520; Rhodes v. Otis, 33 Ala. 578; Lewis v. Coffee, 77 Ala. 190.; Cardwell v. County, 79 Cal. 347; Rowe v. Granite, 21 Pick. 344; Morgan v. King, 35 N. Y. 454; Haines v. Welch, 14 Ore. 319; Haines v. Hall, 17 Ore. 165.

An easement exists only for the benefit of the dominant owner, and the servient owner acquires no right to its continuance. Jones, Easem. § 6; Mason v. Shrewsbury, L. R. 6 Q. B. 578; Felton v. Simpson, 33 N. C. 84; Peter v. Caswell, 38 Oh. St. 518; Arkwright v. Gell, 5 M. & W. 202; Brace v. Yale, 99 Mass. 488; Smith v. Youmans, 96 Wis. 103; Canton Iron Co. v. Biwabik Bessemer Co., 63 Minn. 367.

*Reynolds & Roeser* and *Calhoun & Bennett,* for respondent Kray.

The contract under which defendants claim the right to remove the dam contemplates doing an act prohibited by law, and is void. G. S. 1894, §§ 6878, 6879; Handy v. St. Paul Globe Pub. Co., 41 Minn. 188; Buckley v. Humason, 50 Minn. 195; Bishop, Cont. §§ 471, 547; 1 Pomeroy, Eq. Jur. § 402; Sandage v. Studebaker, 142 Ind. 148; Woods v. Armstrong, 54 Ala. 150, 25 Am. R. 674, and note; Miller v. Ammon, 145 U. S. 421. While equity will not interfere to punish or prevent merely criminal or immoral acts unconnected with violation of private rights, equity will interfere if the acts are so connected. In re Debs, 158 U. S. 564, 593; Cranford v. Tyrrell, 128 N. Y. 341; Port v. Louisville, 84 Ala. 115.

Waters in a meandered lake of more than 160 acres, capable of beneficial use for fishing, fowling, boating, or for furnishing water

for domestic, municipal or agricultural purposes, are public and navigable waters. Laws 1897, c. 257, § 1; Lamprey v. State, 52 Minn. 181; Miller v. Mendenhall, 43 Minn. 95; Minneapolis M. Co. v. Board of W. Commrs., 56 Minn. 485. Plaintiff will suffer a damage not common to the public by removal of the dam, and hence injunction will lie. Page v. Mille Lacs L. Co., 53 Minn. 492; Aldrich v. Wetmore, 52 Minn. 164; Potter v. Howe, 141 Mass. 357; French v. Connecticut, 145 Mass. 261.

Where the natural flow of water has been diverted or collected by a permanent artificial dam into an artificial channel, and such condition has continued for more than 20 years, the riparian owners obtain a prescriptive right to have the water so remain, and the person who placed the obstruction and all persons claiming under him are estopped from restoring the water to its original state. Beeston v. Weate, 5 El. & B. 986; Sutclife v. Booth, 32 L. J. Q. B. 136; Nuttall v. Bracewell, 4 H. & C. 714; Holker v. Poritt, L. R. 8 Exch. 107, 10 Exch. 59; Roberts v. Richards, 50 L. J. Ch. 297; Jones, Easem. §§ 808–810; Washburn, Easem. § 47; Gould, Waters, §§ 159, 225, 340; Woodbury v. Short, 17 Vt. 387; Ford v. Whitlock, 27 Vt. 265; Belknap v. Trimble, 3 Paige, 577; Shepardson v. Perkins, 58 N. H. 354; Delaney v. Boston, 2 Har. (Del.) 489; Mathewson v. Hoffman, 77 Mich. 420; Smith v. Youmans, 96 Wis. 103; Murchie v. Gates, 78 Me. 300; Canton Iron Co. v. Biwabik Bessemer Co., 63 Minn. 367; Watkins v. Peck, 13 N. H. 360; Bullen v. Runnels, 2 N. H. 255; Flemings Appeal, 65 Pa. St. 444; Green v. Carotta, 72 Cal. 267; Adams v. Manning, 48 Conn. 477; Freeman v. Weeks, 45 Mich. 335; Weatherby v. Meiklejohn, 56 Wis. 73; Middleton v. Gregorie, 2 Rich. L. (So. C.) 631, 638; City v. Althouse, 93 Pa. St. 400. Where a permanent obstruction has been placed in a natural water course, and the flow and level have been changed, and such change continues for more than 20 years, the same rights may be presumed in favor of riparian owners as if such artificial stream had been natural. See cases cited last above. Injunction is the proper remedy. 1 High, Inj. § 794; Lyon v. McLaughlin, 32 Vt. 423; Jones, Easem. § 879; Angell, Waters, § 444.

CANTY, J.

This is an appeal from a judgment enjoining the defendants from removing a milldam at Cold Springs, Stearns county, Minnesota. Plaintiff is a riparian owner, whose land is partly flooded by the water held back by the dam. Two other actions were also brought by other parties against these defendants, and permanent injunctions were awarded against them thereon. They appealed in those actions also, and the three appeals were argued at the same time.

The dam was built in 1856 across the Sauk river, a small stream. A few miles above the dam the river ran through a chain of lakes. At the point where the dam was constructed, it raised the water in the river $7\frac{1}{2}$ feet. The flowage caused by the dam extends up the river 16 miles, covering the chain of lakes, increasing the depth of water in them from $2\frac{1}{2}$ to 4 feet, and overflowing large tracts of lowland around the lakes and along the river. The dam was maintained at this height for more than 41 years. The head of water thus obtained was used first to operate a sawmill, and afterwards a flourmill, and it is conceded that the owner of the mill and dam had long since acquired a prescriptive right to maintain the dam and flood the land which was flooded thereby. In 1897 the defendant Muggli was the owner of the mill and dam, and he entered into a contract with the other defendants whereby, in consideration of $5,000, he agreed to give them the right to remove the dam, and agreed that it should never be rebuilt. The $5,000 was contributed by some 40 farmers (including said other defendants) who owned land overflowed by the dam. The money was paid to Muggli, and the other defendants were about to remove the dam when this action was commenced.

This plaintiff is the owner of 270 acres of land, a part of which borders on the flooded district, and a part is flooded by reason of the dam. The trial court finds that, two years before the commencement of this action, plaintiff purchased this land, the same being then wild and unoccupied; that he purchased the same relying on the stage of water that had been maintained by the dam for more than 40 years, and with the intent to make of the land a pleasure resort for boating, fishing, and other amusements, and immediately thereafter expended $300 in improving it and fitting

it for these purposes; that, as a part of such plan, he and those associated with him constructed a steamboat on said water at the cost and of the reasonable value of $900, and he built at Cold Springs a boat house at a cost of $500, and purchased numerous rowboats, and placed them in the river. All of this was done relying on the then existing conditions, and believing that the dam, and the stage of water thereby created, would be permanently maintained. The steamboat can now make on the lakes and river a round trip of 40 miles. The court finds

"That there is no evidence in this action as to the amount of profit made by said plaintiff and his associates in and about the operation of the said steamboat."

If the dam is removed, it will lower the water bordering on plaintiff's land from 2½ to 4 feet, and destroy the value of these improvements for the purposes for which they were intended. Plaintiff also uses his land for pasturing stock, and the lowering of the water will require him to build some additional fence, but will also give him a considerable area of land which is now submerged. The court further finds

"That the waters in the flowage of said river were never used for the purposes for which they are used by plaintiff until the year 1895," and "that the benefits which the said defendants and their associates will receive from the removal of said dam will be largely in excess of the damages thereby sustained by the plaintiff;"

and that the purpose of such removal is to reclaim said overflowed lands for agricultural purposes.

Respondent Kray contends that water rights obtained by prescription are reciprocal; that, when one party obtains by prescription the right to divert or change the water, the other parties affected thereby obtain at the same time the right to have it remain changed or diverted. The following authorities cited by respondent would seem to sustain him in his position: Sutclife v. Booth, 32 L. J. Q. B. 136; Holker v. Poritt, L. R. 8 Exch. 107; Woodbury v. Short, 17 Vt. 387; Ford v. Whitlock, 27 Vt. 265; Shepardson v. Perkins, 58 N. H. 354; Delaney v. Boston, 2 Har. (Del.) 489; Mathewson v. Hoffman, 77 Mich. 420, 43 N. W. 879; Smith v. Youmans, 96 Wis.

103, 70 N. W. 1115; Weatherby v. Meiklejohn, 56 Wis. 73, 13 N. W. 697; Middleton v. Gregorie, 2 Rich. L. (So. C.) 638.

It is rather difficult to see on what principle such a reciprocal prescriptive right can be sustained, and especially so in this case. Plaintiff's land was wild, and unoccupied by him and his grantors, during all the time in which the owners of the mill were acquiring their prescriptive right. How can the owner of wild and unoccupied land acquire therein a prescriptive right which he has never used and never even asserted? It was conceded by respondent on the argument that it is immaterial, for the purposes of this case, whether the mill owner acquired the easement of flowage by prescription or by grant. It is claimed that, in either case, a reciprocal right would be acquired by prescription after the right of flowage had been exercised by the mill owner continuously for the 20 years, at least, if the owner of the servient estate actually occupied his land during all that time. Friedman, the plaintiff in one of the other actions, did, before the commencement of that action, occupy his land for a sufficient length of time to acquire such a reciprocal prescriptive right, if it can be so acquired, and respondents contend that in that action, at least, the judgment should be affirmed.

The position so taken by the respondent and by the cases so cited amounts to this: Although nothing is done during the whole prescriptive period which is inconsistent with the rights of the party diverting or changing the water, or which will give him a cause of action, or which he can prevent, yet the owner of the servient estate will acquire by prescription a reciprocal easement. But we do not deem it necessary to decide whether such a reciprocal easement can be thus acquired. In all of these cases, except, perhaps, Woodbury v. Short, the equities were all on one side. Those equities were strong, and the result arrived at could have been sustained on the ground of equitable estoppel, which also was one of the grounds given in many of the cases. In each of the cases, the party had made valuable and substantial improvements relying on the apparently permanent character of the change or diversion, and there were no counter equities entitled to very much consideration. In our opinion, there are two elements in this case which distinguish it from nearly all of the cases so cited: (1) The presumably perish-

able character of the dam which holds back this vast reservoir of water; and (2) the strong counter equities of the defendants.

1. Whether or not this dam is of a perishable character is not disclosed by the findings, and the evidence is not returned. Such dams usually are of a perishable character. The burden was on the plaintiff to make out a case that will sustain an injunction, and, if the character of this dam is material, the burden was on him to show its character. We will therefore assume that the dam is perishable. When such a dam holds back such a vast volume of water, it is highly dangerous, and great and constant vigilance is necessary to keep the dam in repair, and of sufficient strength to hold back the water, and keep it from bursting away and causing destruction to life and property below the dam. Such a condition of things is highly artificial, and always continues to be so, and is not, as respondent insists, analogous to the conditions existing in a natural water course. As long as the mill owner uses his mill, and runs it by water power, he will keep up these artificial conditions. But it is not ordinarily fair to assume that he will keep them up longer. These defendants have purchased the rights of the mill owner, stand in his shoes, and now propose to abandon the use of the water for water power in connection with the mill. Have they, under the circumstances, a right to do so?

It is clearly the duty of the owner of such a dam, after he has abandoned the use of it for his own purposes, either to keep it in good and sufficient repair, or else tear it out in such a way as to release in a careful and proper manner the reservoir of water which it confines. He cannot, as respondent assumes, let nature take her course, and permit the dam to go gradually to decay. Then, if he cannot tear the dam out, he must keep it in sufficient repair. It might cost him $1,000 a year to keep it in repair, and the total benefit to all the riparian owners resulting from the maintenance of the dam might not exceed $10 per year; and yet, if respondent's position is correct, these riparian owners would have acquired a reciprocal prescriptive right by which they could compel the perpetual maintenance of this dam. And, even if it were held that they could enter upon his premises and make the repairs themselves, that would not relieve him from liability if the repairs were not properly

made, but he would still be liable for any damages resulting from maintaining a nuisance upon his premises. See Simpson v. Stillwater Water Co., 62 Minn. 444, 446, 64 N. W. 1144. In fact, it is generally held that the owner of such a dam is, except in cases of vis major, an insurer of its safety as to all persons who may be injured by the bursting of it. See Cahill v. Eastman, 18 Minn. 292 (324); Berger v. Minneapolis Gaslight Co., 60 Minn. 296, 62 N. W. 336, and cases cited. We must hold that, under these circumstances, the riparian owner cannot acquire a reciprocal prescriptive right to have the dam maintained, whether the mill owner acquired his right by prescription or by grant.

However, even in the case where a large reservoir of water is held back by a perishable dam, the riparian owner may, in our opinion, acquire, by equitable estoppel, the right to have the dam maintained at his own expense or at the expense of the owner thereof. But the equities which will give such a riparian owner such a right in such a case must be strong and substantial, and it does not appear that the equities of these plaintiffs are of this character. For all that appears, the burden or risk of maintaining this dam may be so great as to make it highly inequitable that the owners of it should be compelled to maintain it or permit it to be maintained for the benefit of a few of these riparian owners after it had ceased to be used for the purposes of water power.

2. But there is still another reason why the equities of the plaintiffs in these actions are neither strong nor substantial. The defendants have strong counter equities.

The principles which control the application of the doctrine of equitable estoppel are very equitable and flexible, and, in our opinion, such counter equities are entitled to due consideration. Otherwise, the plaintiff would prevail, even though the benefit to him from the maintenance of the dam might not be $50, while the benefits to the defendants from the removal would exceed $50,000. We need not determine whether the equities of any one not a party to this action should be considered in it, even if pleaded and proved. The equities of the plaintiffs in the other two actions were neither pleaded in this action nor found by the court. But all of these plaintiffs might have joined in one action (see Grant v. Schmidt, 22

Minn. 1, and 14 Enc. Pl. & Pr. 1108), and we will consider the case as though they had so joined. We have already stated what are the equities of the plaintiff in this action.

One Friedman brought one of the other actions. The river runs along one side of his farm, and, in its present high stage, furnishes a barrier on one side of his pasture. If the dam is removed, the water will be lowered in the river to such an extent that he will have to build a fence along that side of his pasture, and he will be "somewhat damaged and interfered with." The court further finds that it is entirely practicable and feasible to build this fence at comparatively small cost, and in such a manner that the stock in the pasture may still drink at the river.

The other action was brought by the town of Wakefield. Many years ago the town constructed a public bridge across the Sauk river just below the outlet of the lowest lake of said chain of lakes. In that action the trial court found as follows:

"That if the dam is removed, as threatened by the defendants herein, and the water in said millpond drawn out, a larger current may be created at a point where said pier is erected on the easterly side of said river, on said highway, and the foundation upon which rests said easterly pier may become undermined, in which event said bridge may be endangered, but such result may be avoided by carefully and properly drawing off the water from above the dam, or by protecting the piers of the bridge by riprapping, at a cost of not to exceed $75."

Under these circumstances, the only relief to which the town is entitled is that the defendants should be enjoined from removing the dam, except in such a manner as to draw the water off in "a careful and proper manner." So far as appears, these are all the equities which can be urged by any one against the removal of this dam, and, in our opinion, they are not, under the circumstances, sufficiently strong or substantial to prevent its removal. In none of the cases above cited were the conditions similar to those here presented. True, in Smith v. Youmans, so much relied on by respondent, there was a large reservoir of water confined by a dam; but there were strong equities in favor of the riparian owners who sought to have the ordinary stage of water maintained by the dam, there were no counter equities entitled to any great amount of con-

sideration, and the mill owner did not seek to abandon his dam or his water power. He simply proceeded to use the water in an unusual and irregular manner, by drawing it out of the reservoir in large quantities, and lowering very greatly the stage of water, and then closing the gates, and permitting the reservoir to fill again. This created a constantly recurring nuisance, by periodically exposing the boggy and slimy bottom of the reservoir around the shore. We are of the opinion that the findings of fact will not support the conclusions of law or the judgment.

The judgment is reversed, and judgment for defendants is ordered on the findings.

COLLINS, J. (dissenting).

The consequences to be anticipated from the decision in this case are of such great importance, and in my judgment so disastrous, not only to the people of the locality directly affected, but also to those at other places in the state where water powers were created in the early days, which have since become useless, that I feel compelled to dissent.

The dam in question was built in 1856,—more than 40 years ago, and prior to the admission of this state into the Union in 1858, and prior to the making of the United States surveys in that section of the country,—and the waters in the stream and in the lakes through which it flowed were then raised to the height at which they now stand. When the surveys were made, in 1857, these lakes were treated as natural bodies of water, and the tracts of land bordering thereon were meandered, and the metes and bounds of the shore tracts established in accordance therewith. This was all shown upon the topographical map introduced in evidence. For more than 20 years the shores around these meandered bodies of water have been well defined on the new lines, so that no person unacquainted with the real facts would even suspect that the waters had ever been raised, or that the old original shores had been submerged. To all appearances, the artificial condition has always been the natural. All titles to these surrounding tracts of land were obtained by defendants or their grantors subsequent to these government surveys, and with reference thereto and to the then flooded

condition of the lands which they now propose to obtain by draining the lakes. Their rights are not those of persons whose real property has been submerged by a trespasser, but are simply those of riparian owners upon meandered bodies of water. Their equities are wholly subject to the fact that the waters were raised and the land overflowed while the government was owner, and before the defendants or their predecessors in interest had acquired any rights in or title to the shores.

The proposition of these defendants is to destroy the dam, and thus to draw down and lower the waters of these lakes from two to four feet below the levels at which they were when the surveys were made, and the lands bordering on the lakes meandered, and metes and bounds established. This proposition is the one which meets the approval of this court. To carry it out, an act which is forbidden by law must be performed; for, under the provisions of G. S. 1894, §§ 6878, 6879, it is made a misdemeanor for any person to drain, or attempt to drain, or cause to be drained, any body of water in this state which has been meandered by the government survey, and where metes and bounds have been established. That is exactly what these defendants claim they have the right to do, and what the court says they may do, under the contract. It seems to me that equities which, to be of any value, must be obtained through a violation of a penal statute, are not entitled to much weight when determining where the real equities are in this case. In the main opinion it is urged that there can be no reciprocal rights as between the parties, because nothing was done during the whole prescriptive period which was inconsistent with the rights of the party flooding the land. If there be any force in this argument, it follows that a riparian owner above the dam, who was satisfied with its construction, or who was, or at least thought he was, benefited, instead of injured by the flooding of his land, could obtain no rights by acquiescence. He would have to remain in uncertainty and doubt as to whether he had best object to the flooding, and seek compensation for an act which was not injurious in fact, or which he believed to be no injury, or he would have to remain silent, and take the chances of having nothing done in the

77 M.—16

future which would prove a serious detriment to his property. I see no manner in which he could protect himself against future injury, except by making such improvements as would appear to a court to create greater equities in his favor than could be presented by his adversary.

It is assumed in the main opinion that the dam is of a perishable character, and may go out, causing great damage to property below, for which defendant Muggli would be held liable. This fact seems to have great weight with the majority. The dam has been in place 40 years, and I am of the opinion that it is hardly fair to the plaintiff to assume that it may give way, or, if it did, that loss and destruction of property would ensue. But, as I understand the theory on which the cases are decided in which the doctrine of reciprocal rights has been applied, it is that the artificial conditions which once existed have become the natural conditions. In other words, and briefly stated, what was once an artificial obstruction to the flow of a stream has, through lapse of time and the change it has wrought in the conditions, become a natural one. If this be so, the dangers which it is suggested lie in wait for defendant Muggli, should the obstruction be swept away and injury result to the riparian owners below, are not so great as anticipated.

Referring again to the doctrine of equitable estoppel, let me call attention to the fact that, if comparative benefits are to be considered, no one would be safe, for he would never know what might be the fact when it became necessary for him to invoke the aid of the doctrine. He might be safe in making improvements to-day, relying upon the conditions, and absolutely without protection to-morrow. I do not think that the doctrine of equitable estoppel is to be influenced by weighing the benefits as between the parties. But I will not discuss the questions further. The cases which are mentioned in the main opinion go into the subject of reciprocal rights and of equitable estoppel in cases of this character quite fully. See also Village v. Savoy, 103 Wis. 271, 79 N. W. 436, and Priewe v. Wisconsin, 103 Wis. 537. I am of the firm opinion that when the defendants propose to appropriate—not to reclaim—submerged land outside of the meander lines, to which they have no right or title except as owners of the meandered tracts, and in order to do

this must violate a criminal statute, they have no equities which should be allowed to outweigh and overcome those which have been presented by plaintiff and another riparian owner, who is plaintiff in one of the companion cases. I am opposed to the establishment of any rule which will countenance or permit the drainage and destruction of any of the splendid bodies of water with which the state is blessed, whether natural originally, or recognized as natural by the general government when causing surveys to be made, and thereafter so considered by the people, and which have become natural in fact, unless such rules are the inevitable result of careful research, based upon the clearest principles, and sustained by the undoubted weight of authority.

BUCK, J.

I agree with Justice COLLINS.

A petition for reargument having been presented in this case and in the two cases which follow next after, the following opinion was filed August 1, 1899:

START, C. J.

A petition for reargument herein having been duly made and considered, it is ordered that the petition be, and it is hereby, denied, and the stay heretofore entered herein vacated; but ordered, further, that the order heretofore entered herein, remanding the case to the district court, be modified so as to read as follows:

"Ordered, that a new trial be, and is hereby, granted in each of the cases, and that remittiturs be sent down accordingly."