CANTON IRON COMPANY v. BIWABIK BESSEMER COMPANY.[1]

January 7, 1896.

Nos. 9794—(332).

| 63 | 367 |
| 84 | 98 |
| 63 | 367 |
| 86 | 74 |

**Surface Water—Diversion—Equitable Estoppel.**

Where the owner of an upper or dominant estate, for the benefit of his own land, diverts into an artificial ditch surface waters which previously and naturally flowed in a ravine from his land upon and through a lower or servient estate, the effect of the diversion being to relieve the latter of the burden of the waters, the owner of the servient estate does not acquire any right to the continuance of this immunity, or to prevent the owner of the dominant estate from restoring the waters to their original and natural channel, unless the facts are such as create an equitable estoppel, as where, for example, the owner of the dominant estate has, by words or acts, represented that the diversion was to be permanent, and the owner of the servient estate, in reliance upon these representations, has so improved or otherwise changed the condition of his premises that it would be inequitable to him to permit the owner of the dominant estate to restore the waters to their original channel, and again subject the lower estate to its former servitude. *Held*, that the facts alleged in this case are not sufficient to create any such equitable estoppel.

Action in the district court for St. Louis county to restrain defendant from causing or suffering surface water to flow upon plain-

[1] Reported in 65 N. W. 643.

tiff's land.    The court made a temporary restraining order and after-
wards made an order continuing the same in force.    From both or-
ders, as well as from an order, Morris, J., overruling a demurrer to
the complaint, defendant appealed.    Reversed.

*Billson, Congdon & Dickinson,* for appellant.

*Draper, Davis & Hollister,* for respondent.

MITCHELL, J.[2]    Stated briefly, and according to their legal ef-
fect, the material facts alleged in the complaint were as follows:
The defendant was the owner of the E. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$, and the
plaintiff of the S. W. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$, of a certain section.    Both tracts
were iron mineral lands, and each party was engaged in opening
and working mines on its property.    The openings to these mines
are open pits, and the ore is taken out by means of underground
drifts, and elevated through shafts.    The natural slope of the lands
is towards the south.    "While said lands were in their natural
state," they were traversed by a ravine which ran southerly or
southwesterly across defendant's north 40, and thence, in a like
direction, across plaintiff's land.    "The land on either side of said
ravine slopes towards the same, and forms a watershed."    At cer-
tain seasons of the year, large quantities of surface water from rain
or melting snow gathered from this watershed, and flowed down
this ravine.    During the dry seasons of each year the ravine con-
tained no water.

In the summer of 1893 the defendant, "in the course of the devel-
opment of its mines [situated on its north forty], and for the pur-
pose of preventing the flow of water from said ravine into its min-
ing excavations, which are open pits, and for the further purpose of
obtaining a head of water for use in carrying on its mining opera-
tions," constructed a dam across the ravine, upon its own land (the
north 40), and in 1894 cut a sluiceway or artificial ditch from the
ravine immediately below the dam, and running thence in a south-
easterly direction, whereby all the water in the ravine was diverted
and carried through this artificial channel into and upon defendant's
south 40, where it collected into a large pool or pond.    The re-
sult was that thereafter the water flowing in the ravine was entirely

2 Buck, J., absent, took no part.

cut off from the land of the plaintiff. Plaintiff's land underneath the bed of the ravine contained large deposits of ore, which it was engaged in mining, and one of its ore pits was directly in the course of the ravine. In the usual course of mining, when the ore underneath is removed the earth above is allowed to cave in, and to rest on the remaining mineral underneath. At the time of the diversion of the water from the ravine by the defendant as above stated, the plaintiff had not allowed any part of the surface of its mine to cave in; but afterwards, and when, under the then existing condition of things, it was impossible for any of the water flowing in the ravine to reach its lands, the plaintiff, "relying upon said state of affairs," and "upon the said permanent diversion of the waters of said ravine as aforesaid," caused and allowed, the ground from under which it had removed the mineral to "cave in," and took no precaution to guard against or prevent the waters of said ravine from flowing into or upon the "covered" portions of its mine. The defendant threatens to cut the dam and close the artificial ditch, and cause the waters to again flow down through the original ravine, into and upon plaintiff's land. If this is done, the water would, in the wet season of the year, flow into and upon the caved-in portions of plaintiff's land, and into its mines, in such large quantities that it could not pump it out with its present appliances. Pumping machinery capable of doing this would cost $10,000. Furthermore, the effect of the water flowing into and percolating through said caved portions of the mine would be to mingle the earth with the ore, and to render the latter entirely unmarketable. This action is brought to enjoin the defendant from doing the threatened acts.

It is to be noticed that there is no allegation of any contract or agreement between the parties that this diversion of the waters should be permanent, or that defendant should not restore them to their original and natural channel. Neither is there any allegation that defendant ever represented to plaintiff that such diversion was intended to be permanent. The only allegation in that regard is that the defendant had not, by any act or notice, indicated an intention to change the condition of the dam and ditch, or to convey the waters flowing in the ravine in any other course, except through the ditch, until a few days before this action was commenced. Moreover, the gist of plaintiff's cause of action is not a failure of the de-

63 M.—24

fendant to give it reasonable notice of the contemplated change, so that it might have time to protect its property against the consequences, but that defendant has no right to make the change at all. Nor is there any allegation that the contemplated change is wanton or unnecessary on part of the defendant. The presumption is that, the artificial diversion having subserved defendant's purpose, it now proposes to restore the waters to their original and natural course for some valuable purpose in connection with the development and working of its own property. It may perhaps be inferred from the complaint that the defendant proposes to construct a conduit or artificial channel to carry the water around a place where the original bed of the ravine has caved in. But as this is wholly on defendant's own land, and as the water will be restored to the bed of the natural ravine before it reaches plaintiff's land, this fact is wholly immaterial. It does not appear that there was any water in the pond above the dam, so that the cutting of the latter, and restoring the flow of the water to its natural and original channel, would result in casting any accumulations of water upon plaintiff's land. Hence, in its last analysis, the case is one where, after having, for purposes of its own in working its mines, diverted these waters from their natural channel through plaintiff's land, the defendant proposes, for like purposes, to restore them to their original channel, where they will run in their natural flow, as before.

Counsel have devoted considerable space to the question whether these were surface waters, or a water course, and also to the discussion of the general principles of law governing surface water. But it seems to us that these matters are wholly irrelevant to the case. Whether they constitute a water course, or mere surface waters, it seems to us self-evident that defendant has a right to do what it proposes, in restoring them to their original channel, unless, under the circumstances, it is prevented from doing so upon the principles of equitable estoppel. As the diversion of the waters had only continued a little over a year, no question of a right by prescription is involved.

It seems to us that upon the facts alleged the case is simply one where the owner of the upper or dominant estate, for a temporary purpose of his own in the improvement of his own property, had relieved for the time being a part of his land from the burden of the

waters, by diverting them from their natural channel, which resulted in the servient estate being likewise relieved from the same burden, and where, after his temporary purpose has been subserved, the owner of the dominant estate proposes to restore the waters to their natural course.    This diversion was exclusively for the benefit of the dominant estate, and could not operate to create a new right for the benefit of the servient estate; and the owner of the dominant estate had a right to discontinue the diversion, and restore the water to its original channel and flow, whenever the diversion became onerous, or ceased to be beneficial, to him.    Gould, Waters, §§ 225, 340, and cases cited; Arkwright v. Gell, 5 M. & W. 203, 230; Wood v. Waud, 3 Exch. 748, 776; Mason v. Shrewsbury & H. R. Co., L. R. 6 Q. B. 578.    This rule is, we admit, subject to limitation by the doctrine of equitable estoppel, or estoppel by conduct, and we are by no means prepared to say that we would not apply that doctrine more liberally than was done in some of the cases cited.

We do not controvert the doctrine announced in such cases as Woodbury v. Short, 17 Vt. 387, and Ford v. Whitlock, 27 Vt. 265, that where the diversion of a stream affects other proprietors favorably, and the party on whose land the diversion is made causes or permits the stream to flow in its new channel for so long a time that new rights may be presumed to have accrued, or have in fact accrued, in faith of the new state of the stream, he is bound by it, and cannot return the stream to its former channel.    This is but an application of the familiar principles of equitable estoppel.    There is no necessity here to restate what is essential to create an estoppel by conduct in such a case.    Suffice it to say that, to create such an estoppel in this case, the defendant must have represented by words or acts that the diversion of these waters was to be permanent; that plaintiff, in reliance upon, and with a right to rely upon, these representations, has so changed its condition in the manner of operating its mines that it would be inequitable to it now to permit defendant to restore the waters to their original channel.    The allegations of the complaint do not make out such a case.

The manifest object of making the diversion was a temporary and not a permanent one.    There was nothing in the situation that would reasonably suggest that the diversion was designed to be permanent.    On the contrary, everything indicated that it was only

designed to be temporary, and that when its temporary purpose was subserved it would be abandoned. The diversion had continued only a short time. The defendant had never contracted, or even stated, that it should or would be permanent. If the water is mere surface water, as both parties claim, and as doubtless the fact is, there would be even less on which to base a presumption that the diversion was intended to be permanent, than if it had been a permanent water course. The natural presumption would be that the defendant would restore the water to its original course whenever this would render it less of a burden to its land than to allow it to continue to flow in the artificial ditch into and upon another part of its premises. Under the facts of this case, the plaintiff must be deemed to have taken its chances on the continuance of the diversion which relieved its land of the burden of this water. It has no more right to the continuance of this immunity than if it had been caused by defendant's pumping the water out of the ravine by steam engines. Of course, it had a right to reasonable notice of the proposed restoration of the water to its natural channel, in order that it might take measures to protect its mines; but, as already stated, this is neither the gist nor ground of the action.

The order overruling the demurrer to the complaint, and the order refusing to dissolve the injunction, are both reversed.