PHILIP H. KRAY v. ANTON MUGGLI and Others.[1]

June 28, 1901.[2]

Nos. 12,647—(152).

### Diversion of Water—Prescriptive Right.

Where the flow of a stream of water has been diverted from its natural channel, or obstructed by a permanent dam, and such diversion or

---

[1] JACOB FRIEDMAN v. ANTON MUGGLI and Others.

June 28, 1901.

Nos. 12,646—(151).

Appeal by plaintiff from an order of the district court for Stearns county, Searle, J., denying a motion for a new trial. Reversed.

*Reynolds & Roeser*, for appellant.

*G. W. Stewart*, for respondents.

BROWN, J.

The decision in Kray v. Muggli controls the determination of this case, and the same order is made.

Order reversed.

START, C. J., dissents.

[2] Reported in 86 N. W. 882, 1102.

obstruction has continued for the time necessary to establish a prescriptive right perpetually to maintain the same, the riparian owners along such stream of water, who have improved their property with reference to the change and in reliance on the continuance thereof, acquire a reciprocal right to have the artificial conditions remain undisturbed; and the person who placed the obstruction in the stream, or caused the diversion of the waters, and all those claiming under or through him, are estopped upon principles of equity from restoring the waters to their natural channel or state to the injury of such riparian owners.

Appeal by plaintiff from an order of the district court for Stearns county, Searle, J., denying a motion for a new trial. Reversed.

*Reynolds & Roeser*, for appellant.

*G. W. Stewart* and *Stewart & Brower*, for respondents.

BROWN, J.

This was an action to restrain and enjoin defendants from removing or destroying a certain milldam across Sauk river at Cold Springs, in Stearns county. The defendants recovered in the court below, and plaintiff appeals from an order denying a new trial. A former appeal in the case is reported in 77 Minn. 231, 79 N. W. 964, 1026, 1064.

The facts are substantially as follows: In 1856 a dam was built and constructed across Sauk river at Cold Springs, Stearns county, by the Cold Springs Mill Company, which has ever since, except during a short period in 1865, when out of repair, been maintained for the purpose of developing water power to propel and operate mill machinery. No authority was obtained to so construct or maintain the dam by application or resort to legal proceedings, but the same was so built and constructed without special or granted right, and subsequently maintained by the mill company and its successors for over forty years, with the acquiescence and consent of the owners of riparian property affected thereby, by reason of which continued maintenance, and the consequent raising of the level of the water, and the adverse, uninterrupted, and exclusive use of the dam for said period of forty years, the mill company and its successors, Muggli and his

grantors, acquired the right by prescription perpetually to maintain the same. The effect of the dam was to raise the level of the waters of the river to a height of 7½ feet, cause the same to set back and overflow large tracts of adjacent land to a distance of about sixteen miles up the river, and the formation of several lakes and ponds along its course. By the construction of the dam, and the consequent raising of the level of the waters of the river, the greater part of the land described in the complaint has since that time been overflowed and rendered valueless for agricultural purposes.

The defendants, other than defendant Muggli, own land abutting upon the river, and are residents and freeholders of the towns through which the river runs and flows. Nearly all of said defendants and their grantors have for more than forty years owned and occupied the lands so adjacent to said river and the lakes, and have cultivated and improved the same with reference to the conditions created and caused by the dam and the increased quantity of water occasioned thereby. Some of the defendants owned and occupied land bordering on the river prior to the construction of the dam, and so far as the record in the case shows at no time did they object to the dam or to its maintenance. At the time of the construction of the dam the public domain in this section of the state was unsurveyed. It was subsequently surveyed, and with reference to the conditions existing, with the waters of the river raised above its natural level 7½ feet, and the lakes formed thereby were meandered in all respects as though natural bodies of water. Some time prior to the commencement of this action defendant Muggli, who owns the mill property, entered into a contract with the other defendants by which he attempted to sell and transfer to them the right to take out and remove the dam; such other defendants paying him for that right and privilege the sum of $5,000. It is claimed by such defendants that by the removal of the dam large tracts of submerged land will be reclaimed and made valuable for agricultural purposes. Acting under this contract, such defendants threatened to take out and remove the dam, and this action was brought to restrain them from doing so.

The action was tried in connection with that of Friedman v. Muggli, the object of which was the same as the object of this action. They were submitted to this court together. Plaintiff in this action is in the actual possession, under claim of title, of land bordering on the river, and has improved the same with reference to the conditions existing subsequent to the construction of the dam. His improvements were made in reliance upon the continuance of such conditions, and that the level of the waters in the lakes would remain as it had existed for years prior thereto, and for purposes of a pleasure resort, and for boating, fishing, and other amusements, in and about which improvements he expended a large sum of money, which will be practically a total loss if the dam is taken out. A portion of the land has been used for the pasture of stock, and the state of water as made by the dam is necessary to be maintained in order that he may fully enjoy his property. He placed a steamboat in the river at Cold Springs, which boat is used for transporting passengers from that point to a distance of about twenty miles up the river; and, if the waters are lowered to their stage before the erection of the dam, the river will be made nonnavigable, and the lakes almost wholly destroyed.

In the other case Friedman, the plaintiff therein, owns a large tract of land bordering on the river, and has been such owner and in the actual possession for the past thirty years. His land is used exclusively for farming and agricultural purposes. His fences, buildings, and other improvements were erected and made with reference to the artificial stage of the waters, and, if lowered by the removal of the dam, he will be greatly injured and damaged in the enjoyment of his property. The findings of the trial court with reference to the rights of the respective parties in the two actions are very full, and detail the facts with greater particularity than is necessary in this opinion. What we have stated, however, will give a general idea of the situation of the parties and the merits of the controversy.

When the action was here on the former appeal, it was determined adversely to plaintiff on the theory of comparative equities; it being held by the majority of the court at that time

that the continued maintenance of the dam would work a greater pecuniary injury and damage to the defendants, who, as we have noted, purchased the right to remove the same, than the removal thereof would result to plaintiff. The reasoning of the opinion on the former appeal we are satisfied, after mature reflection, was erroneous and cannot be followed. The evidence before us at this time is materially different from what it was on the former trial. The trial court expressly finds that there was received on this trial a large mass of new and additional evidence, and the findings of fact are different in one respect, at least, from what they were on the former trial. This being the situation, the doctrine of the law of the case does not apply. None of the cases hold that such doctrine applies on the second appeal of the same case, where the evidence on the second trial was essentially different from that on the first. McNamara v. Pengilly, 64 Minn. 543, 67 N. W. 661.

To follow the reasoning of the former decision would result in confusion and flagrant inconsistencies. Although the defendants may have shown that the continued maintenance of the dam would work a greater injury to their property and rights than the removal thereof would work to the plaintiff's property, in another action brought by a riparian owner desiring the continuance of the dam it might be shown that the injury and damage to him and his rights would be superior and greater than the injury to the same defendants. So that we would have in one action the solemn judgment of the court that, as between the parties to the particular action, the dam should be maintained in its present condition, and in another action, where other interested parties might seek to have the dam maintained, the solemn adjudication of the court that it be removed. If the equities, from a pecuniary standpoint, may be compared and applied at all, they must, in the nature of the surrounding conditions, be applied as between all those riparian owners and interested parties who desire the removal of the dam on the one hand, and all those desiring it maintained on the other. If the equities in favor of those desiring the removal were collectively greater

and superior to those who desire its maintenance, the comparison might possibly be given effect.

But we are aware of no rule of law under which all such parties could be compelled to join in such an action. It is clear, however, that as between individual owners, contending on the one hand for the maintenance of the dam and on the other for its removal, to apply the doctrine would be to inject into the situation difficulties and conflicting results, from which the court could not extricate itself. It appears from the memorandum of the learned trial judge that his views of the law on this subject were fully in accord with the result we have reached, but he had no alternative but to apply the rule laid down in the former decision of the case. Plaintiff in this action is in the actual possession of the land described in the complaint, and such possession is sufficient on which to base a right of action. Witt v. St. Paul & N. Pac. Ry. Co., 38 Minn. 122, 35 N. W. 862.

Passing the question as to comparative equities, we come directly to the main controversy in the case, namely, what right in law or equity has the plaintiff to insist upon the continued maintenance of the dam? The right to maintain it on the part of the mill company was acquired by prescription. The mill company, in erecting it, obtained no express grant to do so from the riparian owners; but the erection and maintenance thereof for more than forty years created a prescriptive right to continue its maintenance perpetually. The inquiry is, what right, if any, accrued to the plaintiff and his grantors, and the other owners of property bordering on the river and the lakes formed thereby, as a result from the acts of the mill company and the acquisition by it of the prescriptive right to maintain the dam? The riparian owners improved their property, erected their buildings and fences with reference to the artificial stage of the water as made by the erection of the dam, and acquiesced in its maintenance during the time necessary to create and establish in the mill company and its successors the perpetual right to do so. It is contended on the part of plaintiff that there grew out of the relations between the parties, with respect to the construction and maintenance of the dam, reciprocal rights and priv-

ileges,—the right on the part of defendants to maintain it, and the right on the part of plaintiff to insist that it be maintained; while it is contended on the part of defendants that the only rights or privileges resulting from such relations accrued to them, that they may maintain the dam so long as they feel inclined to do so and then destroy it, regardless of the consequences to plaintiff and other riparian owners, and that the only right or benefit which accrued to plaintiff is the very valuable privilege of quietly submitting to the wishes and pleasure of defendants. We adopt the contention of plaintiff as most in consonance with the equity and justice of the case. If plaintiff and his grantors acquired a reciprocal right to have the dam maintained, it is not material that its removal will result in less injury and damage to them than to defendants. Prescriptive right finds no support in pecuniary considerations. It is a right or privilege appurtenant and incident to realty, and passes with the title thereto.

The authorities are numerous that where the flow of a stream of water has been diverted from its natural channel, or obstructed by a permanent dam, and such diversion or obstruction has continued for the time necessary to establish a prescriptive right perpetually to maintain the same, the riparian owners along such stream of water, who have improved their property with reference to the change and in reliance on the continuance thereof, acquire a reciprocal right to have the artificial conditions remain undisturbed; and the person who placed the obstruction in the stream or caused the diversion of the waters, and all those claiming under or through him, are estopped upon principles of equity from restoring the waters to their natural channel or state. Beeston v. Weate, 5 El. & Bl. 986; Roberts v. Richards, 50 Law J. Ch. 297; Jones, Easem. § 808; Gould, Waters, §§ 159, 225; Arkwright v. Gell, 10 Eng. Ruling Cas. 219, 225; Belknap v. Trimble, 3 Paige Ch. 577. In the latter case, one involving the question here presented, the court said:

"I apprehend also that this rule must be reciprocal, and that a proprietor at the head of a stream who has changed the natural flow of the waters and has continued such a change for more than

twenty years, cannot afterwards be permitted to restore it to its natural state, when it will have the effect to destroy the mills of other proprietors below, which have been erected in reference to such change in the natural flow of the stream."

In the case of Woodbury v. Short, 17 Vt. 387, a case involving this principle, it appeared that the course of a stream, running across the land of defendant to plaintiff's land, was changed by a sudden and unusual flood, so that it did not thereafter flow over the land of the latter. Defendant permitted the water to run in the new channel for ten years, and it was held that his acquiescence in the new conditions for so long a time gave rise to a right in plaintiff to insist that the new remain as the natural conditions. Other cases supporting this same doctrine are: Ford v. Whitlock, 27 Vt. 265; Shepardson v. Perkins, 58 N. H. 354; Delaney v. Boston, 2 Har. (Del.) 489; Mathewson v. Hoffman, 77 Mich. 420, 43 N. W. 879. The latter case is very similar to the one at bar, and directly in point. The court there said:

"The exclusive enjoyment of water in a particular way for twenty years, without interruption, becomes an adverse enjoyment sufficient to raise presumption of title against a right in any other person which might have been, but was not, asserted. This rule must be reciprocal, and one who has taken the water from the original channel, and has continued to divert and enjoy it for a period beyond the statute of limitation as to real actions, cannot afterward be permitted to restore it to its original state when it will have the effect to destroy or materially injure the property of those through or by which it formerly flowed."

Smith v. Youmans, 96 Wis. 103, 70 N. W. 1115, is also directly in point. It is there held that it is but a fair inference that riparian owners, in view of the advantages that might or would accrue to them by raising the level of the waters of the lake on which their lands border, were induced to consent and acquiesce therein, and in the use of the dam and waters as raised thereby, in view of which it was held that the relations and interests of the parties thus originated and created became fixed by prescription, and imposed upon each reciprocal rights and duties. The court said:

"It has long been settled that the artificial state or condition of flowing water, founded upon prescription, becomes a substitute for the natural condition previously existing, and from which a right arises on the part of those interested to have the new condition maintained. The water course, though artificial, may have originated under such circumstances as to give rise to all the rights that riparian proprietors have in a natural and permanent stream, or have been so long used as to become a natural water course prescriptively; and 'when a riparian owner has diverted the water into an artificial channel, and continued such change for more than twenty years, he cannot restore it to its natural channel, to the injury of other proprietors along such channel, who have erected works or cultivated their lands with reference to the changed condition of the stream, or to the injury of those upon the artificial water course who have acquired by long user the right to enjoy the water there flowing.'"

See also Canton Iron Co. v. Biwabik Bessemer Co., 63 Minn. 367, 65 N. W. 643.

The dam in question, having been erected for the purpose of developing power to operate mill machinery, must be taken to be a permanent obstruction; and, it having existed and been maintained as such for so great a length of time, the artificial conditions created thereby must be deemed to have become the natural conditions. There is no suggestion in the evidence that the dam was placed in the river for temporary purposes, and, even though it may at one time have been out of repair, it was nevertheless originally intended as a permanent structure. The authorities all hold, as far as our examination has extended, that in such cases the conditions arising from the permanent obstruction, though artificial to begin with, become by long lapse of time the natural conditions, and interested parties are bound by the rules of law applicable to such conditions. Magor v. Chadwick, 11 Adol. & E. 571; Beeston v. Weate, supra; Roberts v. Richards, supra; Mathewson v. Hoffman, supra; Finley v. Hershey, 41 Iowa, 389; Murchie v. Gates, 78 Me. 300, 4 Atl. 698. In the case at bar even nature herself became adapted to the new surroundings. A native growth of hard-wood timber sprang

up along the shores of the lakes formed by the rise of the river, thus giving a natural effect and appearance to the conditions created by the dam. The government, in the survey of the lands in that vicinity, recognized the artificial as the natural state, and surveyed the public lands with reference to the lakes meandering them precisely as other natural bodies of water are surveyed and meandered. There can be no difference on principle between cases where the natural channel of a stream is changed and diverted, and those where a permanent obstruction is placed therein. In either case the rights of the parties are essentially the same.

An examination of the books discloses that this same doctrine is applied to public highways and public parks. Where a highway or public park has been laid out by lawful authority, or acquired by dediction or prescription, the owners of property abutting thereon acquire a special right in the continuance of the park, street, or highway, as the case may be, of which they cannot be deprived except by due process of law. The right accrues to them, in cases where the highway or park is acquired by dedication, by the same proceedings and acts that vest the right in the public. Where land is expressly dedicated for a public park, and is improved as such by the public authorities, special rights result and accrue to abutting owners, which vest and are created by the act of dedication. Adams v. Chicago, B. & N. R. Co., 39 Minn. 286, 292, 39 N. W. 629. In the case of Moose v. Carson, 104 N. C. 431, 10 S. E. 689, it was held that the owners of lots cannot be deprived of the easement appurtenant in the street adjacent thereto, which is distinct from the public right, nor can the legislature grant power to take it from them. The abutting owners in such cases have the right to insist that the street remain.

The case of Le Clercq v. Trustees, 7 Ohio, 218, was an action by owners of lots adjoining a public park, which had been dedicated to the public use by the owner of the land, to enjoin the public authorities from vacating the park. It was there held that the plaintiffs, though individual owners of lots abutting the public square, could maintain their action to preserve the park for

public use. It appeared that they improved their property with reference to the park, and the decision was placed distinctly on the ground that the act of dedication conferred upon them a separate and independent right to have the park maintained. In the case of Town v. Leopold, 106 Ind. 29, 5 N. E. 761, it was held that the owners of lots abutting the public street have a peculiar and distinct interest in the easement, and that such interest is distinguished from the rights of the general public, in that it becomes an interest legally adhering to the contiguous grounds and buildings thereon, by affording more convenient facilities for their use; and, as the owner of the abutting property may have erected his buildings and made his improvements with reference to the street as existing, it is a valuable property right, which is recognized by the law, and cannot be appropriated or taken from him without his consent. Elliott, Roads & S. §§ 150, 877. The act which gives rise to the public right, the act of dedication, vests a distinct and independent right in abutting property owners, which they may protect by application to a court of equity.

The doctrine of these cases is applicable to the case at bar. The mill company acquired its right to maintain the dam by prescription, and during the time such right was maturing a reciprocal right in the riparian owners to insist that it be maintained, at least that no overt act be taken for its removal, was also maturing, which ripened and became equal to the right of the mill company upon the completion of the prescriptive period. The reciprocal right thus created was not merely a personal one, but a right appurtenant and incident to the lands.

Something was said on the argument with reference to the right of a mill owner to abandon his mill and permit the dam to become out of repair and finally destroyed by the elements, and the question was suggested as to whether he could be compelled to repair the same or be required to maintain the dam after its abandonment; and it is further mooted whether or not the riparian owners would have the right to enter upon the mill owner's property, in the case of his failure or neglect to keep the dam in repair, and put it in order and maintain it at their

own expense. These questions are not involved in the case, and we do not decide them. When they are presented in any proper case they will be taken up and disposed of in the usual way. It may be doubted whether the mill owner could be compelled to maintain the dam in good repair. No principle of law making it his duty to do so now occurs to us. But it is not so clear but that the riparian owners, having acquiesced in the maintenance of the milldam for such a length of time as to create a perpetual right in the mill owner to maintain it, out of which, within the authorities we have cited, grew the reciprocal right to insist that it be not disturbed, and that the water as raised by the dam be maintained at its artificial height, would have the right to enter upon the property and repair any defects in the dam, and keep and maintain it in order and repair at their own expense.

But these questions are not before the court, and we do not decide them, nor do we wish to be understood as expressing any opinion with reference thereto. The action is to restrain and enjoin defendants from taking any active or affirmative steps looking to the removal of the dam, and whether they may be compelled by law to keep it in repair is not involved in the determination of the case. We hold that they may be restrained from committing any overt act, and from taking any affirmative steps looking to the removal of the dam. Perhaps the apparent difficulties in the matter of keeping the dam in repair after abandonment by the mill owner may be relieved and obviated by an application of the provisions of Laws 1897, c. 88. We have not considered the question whether defendants could be restrained from taking out the dam because of the statutes prohibiting the draining of meandered lakes. The disposition of the case on the other question renders it unnecessary.

The order appealed from is reversed.

START, C. J. dissents.