FRED W. HAMMOND and Others, Plaintiffs, *v.* ANTWERP LIGHT AND POWER COMPANY and Another, Defendants.

Supreme Court, Lewis County, September 13, 1928.

Waters and watercourses — riparian owners — action to restrain defendants from lowering water in Lake Bonaparte — defendants' predecessors acquired right by prescription to raise water in lake — defendants have not acquired right by prescription to lower water to natural level — defendants estopped from asserting right to lower water to plaintiffs' damage — defendants may relinquish right to surplus water — equity will grant relief to plaintiffs — evidence — no proof that witness who testified by deposition was incompetent to testify.

The defendants' predecessors acquired the right by prescription to raise the natural level of Lake Bonaparte. Originally the right was owned by the owner of a

mill and furnace near the outlet of the lake and he used the water of the lake for the purpose of operating his mill and furnace. Occasionally the water has been sold to lower mill owners during periods of dry weather and on one or two occasions the water has been drawn down to the natural level of the lake while the dam was being repaired or reconstructed. The defendants' contention that they have the right to draw the water down to the natural level of the lake cannot be sustained, for the evidence does not show that that right has been acquired by prescription. The only evidence is that on a few occasions the water has been drawn down to the natural level of the lake, but there is no evidence that that condition has been continuous or existed each season.

The defendants, having acquired the right to maintain the level at a certain maximum and minimum, cannot burden the easement by withdrawing the water below the minimum acquired by the prescriptive right, and the plaintiffs have the right to have the water maintained at the level at least of the minimum heights heretofore maintained by the defendants.

The defendants should be estopped from asserting to plaintiffs' damage the right to materially reduce the level of the lake from that maintained by them during all the time they were acquiring their title, and while plaintiffs' predecessors in title were sitting idly by and acquiescing therein.

The plaintiffs cannot acquire any right by prescription to keep the water at a specified level for the purpose of boating, bathing or fishing, but they can acquire the right to have the water along the line of their own property maintained at its legal height, which, in this case, is at least the minimum height acquired by the defendants through prescription.

*It seems,* that if the time should ever come when the defendant power company should wish to relinquish its rights to the surplus water in the lake, it would have a legal right to abandon its easements, notwithstanding the rights acquired by the plaintiffs.

It is the duty of a court of equity to grant relief in a case of this character.

The testimony of one of the witnesses, which was taken by commission, was properly admitted in evidence although it appears that in proceedings instituted in 1927 she was declared incompetent to manage her affairs, and that a committee was appointed of her person and property. A person may be mentally unsound and still be competent as a witness. A reading of the testimony of the witness would indicate that she was possessed of a good memory and understood the questions and appreciated her answers.

ACTION for injunction.

*Wilbur A. Porter* and *Delos M. Cosgrove,* for the plaintiffs.

*Fred K. Felshaw* and *Thomas Burns,* for the defendants.

EDGCOMB, J. The scene of this action is laid in the Adirondacks on Lake Bonaparte, a natural body of fresh water about two square miles in area. The shore line is hilly and wooded. The climate is cool; the air is fresh and invigorating; the scenery is rugged and inspiring. This, together with excellent fishing, has made the locality a deservedly popular summer residence. The plaintiffs are property owners abutting on the shores of the lake, many of whom have erected expensive summer homes and boathouses.

The lake is fed by several streams, and drains a watershed of

considerable area. Just beyond and to the northwest is a small body of water known as Mud lake, at the end of which is a hamlet called Alpine. The waters of Lake Bonaparte flow through a short outlet into Mud lake and from there into Bonaparte creek. This stream empties into the Indian river, and its waters finally reach the St. Lawrence.

The defendant Antwerp Light and Power Company is a public service corporation engaged in the generation and sale of electricity for light and power. Joseph Baumert, the other defendant, is its principal stockholder, president and general manager. He ran the business personally from 1904, when he bought it from Augsbury Brothers, until January, 1910, when he organized the defendant corporation, and transferred to it the property and business. The company has two plants on the Indian river, one at Antwerp and the other at Philadelphia. It furnishes the street lighting for the village of Antwerp, and serves upwards of 400 private customers in that vicinity. It generates its electricity largely from its Philadelphia plant, and is entirely dependent upon the flow of the Indian river for its source of power. The company owns certain real property at the outlet of Mud lake at Alpine, and has constructed a dam across the creek at this point, by means of which it has impounded the waters naturally flowing from Lake Bonaparte, and raised the surface of the lake to such an extent that it has repeatedly flooded the lands of the plaintiffs, and in times of high water has rendered their boathouses useless. In order to regulate the flow in the Indian river and give sufficient power to run its plants in times of drought, the company has so operated the gates in the dam as to draw down the waters of Lake Bonaparte, many times to the lowest possible water mark, and thus leave the boathouses of the various plaintiffs high and dry, and the shore line opposite and contiguous to their property far away from the water, and render the wide margin thus exposed muddy, dirty and unsightly, and in a repulsive and unpleasant, if not an unhealthy and injurious, condition. The result has been that the locality has ceased, to some extent at least, to be attractive as a summer home or as a resort, and the property of the plaintiffs has been injured and partially destroyed in its use and value.

Claiming that the defendants have no right to thus interfere with the natural flow of the lake and its outlet, and that their action in so doing has brought irreparable injury to the property of the riparian owners, the plaintiffs have brought this action in equity, asking that the defendants be enjoined and restrained from raising or lowering the level of the water in Lake Bonaparte beyond certain limits.

Plaintiffs are riparian owners on Lake Bonaparte, and as such are entitled, in the absence of grant, license or prescription limiting their rights, to the use of the water in the lake as it is wont by nature to flow, without material alteration or change. Defendants justify their action and defend upon the ground that they have acquired the legal right to do what they have done by prescription. They allege in their answer that they and their predecessors in title have maintained a dam at Alpine for at least sixty years last past, and have changed the direction and course of the waters of the lake during all this time in substantially the same manner in which they are now being diverted.

Upon the trial defendants offered in evidence the deed to the Antwerp Light and Power Company of the Alpine property from Arman H. Braman and others, dated May 18, 1923, and recorded in the Lewis county clerk's office June 18, 1923. That instrument purported to convey to the grantee not only the real property therein described, but also the dam at Alpine and all riparian, water power and flowage rights appurtenant thereto, and the right to maintain the dam at its then height and " to impound the water to such level, to draw the water as desired for any purpose, and to reconstruct the same and build other dams should the grantee, its successors or assigns, at any time deem the same necessary." Defendants then asserted, through their counsel, that they claimed an absolute right, by grant as well as by prescription, to withdraw from the lake as much water as would flow therefrom. It must be conceded that whatever privilege defendants' grantors acquired by prescription to the waters in Lake Bonaparte attached to the land, and passed by conveyance to the subsequent grantees. The deed above mentioned is the first and only one which mentions or purports to convey any water rights. All previous conveyances describe land only. A grantor can only convey what he owns. If the grantors of the defendant corporation had no legal right to withdraw the water impounded in the lake in such quantities as they desired, their transfer of such rights to the Antwerp Light and Power Company means nothing, and gives to such grantee no such privilege. We, therefore, get back to the question of just what prescriptive rights defendants' predecessors in title acquired to the water in Lake Bonaparte.

Many years ago a mill and a furnace were erected at Alpine. To enable them to be operated by water power, a dam was built across Bonaparte creek by the then owners of the property. Just when the original dam was constructed does not appear, but it was somewhere around 1857. In 1897 the structure was partially destroyed; it was reconstructed during that year by William Roberts,

the then owner of the property, and the crest of the dam was raised eighteen inches higher than the old structure. In 1905 a new cement front was put in.

In 1903 Ambrose E. Austin, a riparian owner on Lake Bonaparte, commenced an action in equity against William Roberts, the then owner of the dam at Alpine, to enjoin the interference by him with the natural flow and course of the waters of the lake and outlet. It was determined in that action that Roberts had the right by prescription to raise the water of Lake Bonaparte for the purpose of operating machinery to the height that the said water was raised by the dam as it existed prior to 1897, but no higher. Judgment was entered accordingly.

In the fall of 1920 a new dam was built by the Antwerp Light and Power Company a short distance up stream from the old structure, in an attempted compliance with the provisions of the Austin-Roberts judgment, the crest of which new dam was eighteen inches below that of the old one.

On the trial of the instant case the judgment in the Austin-Roberts case was offered in evidence. It was asserted that defendants' rights to impound water in Lake Bonaparte were fixed by that judgment. The parties then stipulated that the Antwerp Light and Power Company was entitled to impound and raise the water of Lake Bonaparte by means of a dam at Alpine to the same height that it could be impounded by the new dam constructed by the defendants in 1920, the crest of which was the same height as the one which existed prior to 1897.

That concession simplified the case to the extent of eliminating the issue of defendants' right to raise the water of the lake, and left only for consideration and determination the question of how much water, if any, the defendants could drain from the lake. That issue was not passed on by the court in the Austin-Roberts case. The findings and judgment in that action were silent on the right of the owners of the property at the outlet to withdraw any water from the lake, except such as might be necessary to operate machinery.

As the judgment in the Austin-Roberts case is really the starting point here, it is well to remember that in that action Roberts had no actual grant; that whatever rights he possessed in the waters of the lake were acquired by prescription prior to 1897; that such rights were measured by the use of such water during the prescriptive period, and by the dam, as it then existed, and before it was rebuilt in 1897. It must also be borne in mind that this judgment limited the right to use the waters of the lake impounded by said dam to the operation of machinery.

The defendants insist that the right to impound water in the lake carries with it a corresponding right to draw that water out at such times, and in such quantities and manner as they may desire, and that, to such primary rights as they are given by law to the natural flow of the waters of the lake through the outlet, they have added, by prescription, the right to the use of all the water impounded by the new dam. I do not think that such conclusion follows as a matter of course. Whether such determination is finally reached depends entirely upon circumstances.

Title by prescription is an affirmative defense, and must be affirmatively alleged and proven. The burden of establishing adverse possession rests on him who seeks to rely upon it. (*Neale* v. *Seeley*, 47 Barb. 314; *Hammond* v. *Zehner*, 23 id. 473; affd., 21 N. Y. 118; *Cramp* v. *Dady*, 162 App. Div. 321; *Blixt* v. *Eltoma Realty Co.*, 138 id. 499; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574, 582.)

Such title can never be established by mere inference or conjecture, but must be shown by clear and positive proof. (*Lewis* v. *N. Y. & H. R. R. Co.*, 162 N. Y. 202, 220; *Heller* v. *Cohen*, 154 id. 299, 311; *Doherty* v. *Matsell*, 119 id. 646; *Cutting* v. *Burns*, 57 App. Div. 185; *Pines* v. *Traktman*, 109 Misc. 680; affd., on opinion at Special Term, 189 App. Div. 904; *Sanders* v. *Riedinger*, 19 Misc. 289; *Jackson* v. *Waters*, 12 Johns. 365.)

The rule is well established that the extent of a right acquired by prescription is measured by the use and enjoyment thereof during the prescriptive period. (*Bremer* v. *Manhattan R. Co.*, 191 N. Y. 333, 338; *Lewis* v. *N. Y. & H. R. R. Co.*, 162 id. 202, 225; *Prentice* v. *Geiger*, 74 id. 341, 347; *Rexford* v. *Marquis*, 7 Lans. 249, 262; *Brooks* v. *Curtis*, 4 id. 283.)

It was said in *Prentice* v. *Geiger* (*supra*): " The right acquired by prescription is commensurate with the right enjoyed. The extent of the enjoyment measures the extent of the right."

Bearing in mind the above rules, it becomes necessary to determine just what use the predecessors in title of the defendants actually made of this water during the prescriptive period. For upwards of forty years prior to 1897 they maintained a dam on their property across the outlet of the lake for the purpose of creating hydraulic power to run their mills and machinery located at the dam. That raised the water in the lake higher than it would ordinarily have been at certain periods, and set it back on the lands of the riparian owners. The water thus impounded was not stored indefinitely in the lake, but was used in such quantities as might be necessary to generate power with which to run the machinery in the mill and furnace located at the dam, whenever those plants

were in operation. Only so much as was required for that purpose was released. The rest was held in the lake. The mills were busy in the spring and summer when the water was usually high. In the fall, when the water was apt to be low, these plants were usually idle. At such times the water remained in the lake, and the level of the water was not lowered by large withdrawals. It is true that on several occasions in an especially dry season the owners sold water to mill owners on the Indian river at Antwerp for the purpose of regulating the flow of the river. These sales, however, were intermittent and infrequent, and there is no evidence of how much water was sold, or how much the level of the lake was reduced thereby.

Notwithstanding the fact that the Austin-Roberts judgment specified the purpose for which this water could be used and confined it to the operation of machinery, all of which at the time was located at Alpine, I am of the opinion that the provision in said judgment relative to the purposes for which this water could be employed was not intended and should not be construed as limiting the exact spot where or the identical purpose for which such water could be utilized, but rather to measure and limit the quantity which could be drawn from the lake. This is so in the absence of evidence of a contrary intent. (*Hall* v. *Sterling Iron & R. Co.,* 148 N. Y. 432; *Mudge* v. *Salisbury,* 110 id. 413; *Groat* v. *Moak,* 94 id. 115; *Comstock* v. *Johnson,* 46 id. 615; *Henderson Estate Co.* v. *Carroll El. Co.,* 113 App. Div. 775; *Terry* v. *Smith,* 47 Hun, 333.)

If the recent withdrawals complained of by the plaintiffs did not lower the level of the water beyond the point it would have been reduced by the operation of machinery at the dam, or the occasional sale of water prior to 1897, defendants were well within their rights, and plaintiffs cannot complain. Otherwise, the plaintiffs are not without their remedy.

It, therefore, becomes necessary to determine to what extent the water impounded in Lake Bonaparte by the dam at Alpine was withdrawn prior to 1897 and while Roberts, defendants' predecessor in title, and his grantors were acquiring the prescriptive rights fixed by the Austin-Roberts judgment. The evidence in this particular is not of that clear and positive character called for by the authorities cited. The defendants have not, in my opinion, sustained the burden of proof cast upon them of showing that during this prescriptive period they acquired the right to draw the water down to the natural flow and take all that would run down the stream, or to withdraw the water to the low levels which have existed during the past few seasons of which the plaintiffs have been complaining.

The burden rests upon the defendants to show not only that they have gained a prescriptive right to flow the lands of the plaintiffs, but also that they have acquired such right to the extent claimed by them. No witness pretends to say that the use made of this water prior to 1897 exhausted the lake for twenty consecutive years. There is evidence that on several occasions all the water which would naturally flow from the lake was allowed to run down the stream, but that was when the dam was being rebuilt or repaired, and there was no obstruction to hold the water back. Defendants have failed to fix the fluctuation of the water except on the several occasions when the lake was drained down to its natural flow. No one attempts to say how much water was actually sold and delivered to the mill owners on the Indian river, or how much such water lowered the level of the lake. Under the authorities above cited, the court is powerless to infer that, because water was released and used to operate the mills at the dam, or because it was occasionally sold and sent down the outlet into the river, such use lowered the level of the lake to the same extent that defendants now claim they are entitled to reduce it, viz., to its natural level. That right can only be established by clear and cogent evidence.

The defendants admit that to ripen into a prescriptive easement the adverse user must be continuous. That does not mean, they urge, that such use should be a daily one. That is undoubtedly true. But the draining of the lake to the natural flow several seasons out of twenty or more years is not such a continuous use of the water in such a manner or in such a quantity as to give to the defendants a similar right for all time.

The evidence fairly establishes the fact that the quantity of water drawn from the lake by the defendants during the period complained of far exceeds that taken during the prescriptive period, and for that reason, if for no other, gives the plaintiffs a just cause for complaint.

Defendants' claim is subject to attack for another reason. While they have a right to utilize the water withdrawn for any legitimate purpose, the rule is well settled that no change can be made in the use of the easement which will increase the use thereof to any substantial extent, or which will work to the detriment or damage of the owner of the servient estate. If that be done, such owner has his remedy. (*Prentice* v. *Geiger*, 74 N. Y. 341; *Bremer* v. *Manhattan R. Co.*, 191 id. 333; *Lewis* v. *N. Y. & H. R. R. Co.*, 162 id. 202; *American Bank Note Co.* v. *N. Y. El. R. R. Co.*, 129 id. 252; *Griffin* v. *Bartlett*, 55 N. H. 119.)

In *Bremer* v. *Manhattan R. Co.* (*supra*) plaintiff sought to recover damages to his property occasioned by the construction

and maintenance of an elevated railroad in an abutting street. Defendant pleaded title by prescription. More than twenty years before the commencement of the action the defendant had built its tracks and embankment in the street, and thereafter had maintained and operated its road therein. Plaintiff claimed that the character of the user had been changed, and that he was entitled to additional compensation because of the increased burden cast upon his estate. It was held that any increase in the size of, or injurious changes in, the structure erected in the street would constitute an increase of use for which the plaintiff might seek compensation. It was pointed out that an easement to maintain a culvert to drain six acres would not justify the drainage of sixty acres through it, and that a grant of a right of way to one farm would not authorize its use as access to other farms.

In *Lewis* v. *N. Y. & H. R. R. Co.* (*supra*) defendant acquired a prescriptive right to have certain structures which it had erected in Park avenue, in New York city, remain there forever, so far as the plaintiff, an abutting owner, was concerned. Thereafter the old embankment was removed and a new construction was built within the lines of the old structure, but many feet above it, all of which raised the trains much higher in the air than formerly. It was held that the defendant's prescriptive rights were to be measured by the user, and as material changes had been made in the structures, which encroached on plaintiff's rights, such further intrusion cast a liability on the defendant. It was said that if the new structure had been no higher than the old one in front of plaintiff's premises, and had inflicted no more injury upon her property, none of her rights would have been invaded, and she would have been remediless, but because a material change had been made in the user she was granted relief to the extent that she was damaged by the increased use.

In *American Bank Note Co.* v. *N. Y. El. R. R. Co.* (129 N. Y. 252) plaintiff sought to restrain defendant from operating its elevated railroad in the street in front of plaintiff's property. When the road was first constructed, its trains were propelled by a cable. Thereafter steam dummies were substituted, and some eight years thereafter one track was reconstructed in such a manner as to involve a removal of the columns within the sidewalk a distance of sixteen inches from the curb. It was held that these changes materially and substantially affected the plaintiff, and that the prescriptive rights claimed by the defendant were not identical with the original user, and that the user could not be divided and separated. It was said: " In all cases of rights by prescription, the right acquired is measured by the extent of the use, and that in turn by the purpose

of the user; and where essentially different purposes govern separate and successive users, it is rarely, if ever, possible to deem the latter identical in any respect or degree. A right of way for one purpose gained by user cannot be turned into a right of way for another purpose, if the latter adds materially to the burden of the servient estate, and the right derived from user can never outrun or exceed the user in which it had its origin. It is also to be recalled that prescription pre-supposes a grant which conveys a definite right corresponding in all material respects with some equally definite user, which has a distinct and tangible purpose."

In *Griffin* v. *Bartlett* (*supra*) defendant acquired by prescription the right to flow plaintiff's land to the height of his ancient dam. Thereafter defendant repaired and tightened his dam, erected an additional mill, put in new and improved machinery, which consumed less water than was formerly used, and caused plaintiff's land to be flooded to a greater extent than formerly. Defendant claimed such right provided he did not raise the water above the crest of his dam. Held, that he had no right to flow plaintiff's land in a different manner nor to a greater extent than he had formerly done.

The present use put to Lake Bonaparte by the defendants, of using it as a storage reservoir to impound and store water in times of freshet for such indefinite period as they may desire, and to withdraw the same when and in such amounts as their needs may require for their hydraulic developments at Antwerp and Philadelphia, is a far different use from that specified in the Austin-Roberts judgment, and totally unlike the right enjoyed by defendants' predecessors in title during the period they were claiming a right to divert the natural flow of the waters in the lake and outlet, and when the riparian owners along the shore of the lake were quietly submitting to such use. Such changed diversion of this water cannot help but work to the disadvantage and damage of the plaintiffs; it is a servitude upon their lands materially different from and more burdensome than that placed upon it by the original user. That being true, plaintiffs are entitled to relief.

The record is barren of any evidence of withdrawals of water from the lake since the rights under the Austin-Roberts judgment were fixed, which would give to defendants a right by prescription to appropriate water in the manner they are now taking it. The present use or quantities taken have not been continuous for a period of twenty years or more.

I think that the defendants must fail for another reason. During the period of prescription, when the defendants' predecessors in

title were acquiring their right to raise the water in Lake Bonaparte to the height of the new dam, the plaintiffs and their predecessors in title also acquired a reciprocal easement to have the waters in the lake left at the same level as they were maintained during the prescriptive period.

The doctrine of reciprocal easements has not been universally accepted. It has been adopted in some States, and repudiated in others. It has been criticised by certain textbook writers, and approved by others. So far as I have been able to ascertain, the doctrine originated in *Belknap* v. *Trimble* (3 Paige, 577). That was an action in chancery to establish the rights of the plaintiffs, the owners of certain mills situated on the outlet of Great pond, to a dam at the head of the stream by which the surplus waters of the pond were retained for the use of the mills below, until the dry season, when they were released in such quantities as to keep the mills in operation. It was there held that if the proprietor of land at the head of a stream changed the natural flow of water, and continued such change for twenty years, he could not thereafter restore the flow of the water to its natural state to the injury of the owners of mills on the stream. Chancellor WALWORTH says (at p. 605): " The learned commentator on American law lays it down as the established doctrine, both here and in England, that the exclusive enjoyment of water in a particular way for twenty years, without interruption, becomes an adverse enjoyment sufficient to raise a presumption of title, as against a right in any other person which might have been, but was not asserted. * * * I apprehend also that this rule must be reciprocal; and that a proprietor at the head of a stream who has changed the natural flow of the waters, and has continued such change for more than twenty years, cannot afterwards be permitted to restore it to its natural state, when it will have the effect to destroy the mills of other proprietors below, which have been erected in reference to such change in the natural flow of the stream."

I assume that the same reason exists for this rule as does for the rule relating to equitable estoppel. Where one by his conduct induces another to believe in the existence of a certain state of facts, and the other acts thereon to his prejudice, the former is estopped, as against the latter, from denying that such state of facts actually exists.

Here the defendants and their predecessors in title for more than twenty years raised both the maximum and minimum level of the lake. Plaintiffs, or at least some of them, bought or improved their property with this condition in mind. It seems no more than equitable that the defendants should be estopped from now assert-

ing, to plaintiffs' damage, the right to materially reduce the level of the lake from that maintained by them during all the time they were acquiring their title, and while plaintiffs' predecessors in title were sitting idly by and acquiescing therein. The principle is the same whether it be called reciprocal rights, equitable estoppel, or any other name.

The doctrine laid down in *Belknap* v. *Trimble (supra)* has been adopted and followed in the following cases: *Lakeside Paper Co.* v. *State* (15 App. Div. 169); *Townsend* v. *McDonald* (12 N. Y. 381); *Smith* v. *Youmans* (96 Wis. 103); *Village of Pewaukee* v. *Savoy* (103 id. 271); *Kray* v. *Muggli* (84 Minn. 90); *Mathewson* v. *Hoffman* (77 Mich. 420); *Shepardson* v. *Perkins* (58 N. H. 354); *Ford* v. *Whitlock* (27 Vt. 265); *Woodbury* v. *Short* (17 id. 387); *Middleton* v. *Gregorie* (2 Rich. L. [S. C.] 631); *Delaney* v. *Boston* (2 Harr. [Del.] 489); *Warren* v. *Westbrook Mfg. Co.* (88 Me. 58).

The facts in *Smith* v. *Youmans (supra)* are similar to those in the case at bar. Plaintiffs were riparian owners on the shore of Lake Beulah. Defendants maintained a dam at the outlet whereby the waters of the lake were raised to a sufficient level to create a water power for mill purposes. Plaintiffs sued to restrain the defendants from lowering the level of the lake. The court cited *Belknap* v. *Trimble* with approval, and held that the artificial state or condition of flowing water founded upon prescription becomes a substitute for the natural condition previously existing, and that a right arises from such change on the part of those interested to have the new condition maintained.

*Kray* v. *Muggli (supra)* was an action brought to restrain the defendants from removing or destroying a dam across the Sauk river in Minnesota which diverted the waters of that stream. A judgment in favor of the defendants was reversed by the Minnesota Supreme Court upon the ground that the plaintiff had acquired a reciprocal right to have the artificial conditions created by the defendants remain undisturbed. *Belknap* v. *Trimble* was cited as authority for the holding.

The Supreme Court of Michigan in *Mathewson* v. *Hoffman (supra)* gave its official sanction to this rule of reciprocal rights on the authority of the *Belknap* case.

In *Middleton* v. *Gregorie (supra)* the Court of Appeals and Court of Errors of South Carolina says: " No one has a right to divert a stream from its natural current, to the prejudice of those who own lands below. But where it has been done by a party above for twenty years, his original wrong has ripened into a prescriptive right. Let the proposition be reversed. Is the party below incapable of acquiring a right of exemption from having his land

overflowed, by the water's being restored to its natural course? This is what the plaintiff contends for. He says, for more than forty years he has accommodated himself to a state of things existing by mutual consent, or brought about by the acts of the planters above. By way of illustrating his position, suppose that in consequence of the dam he had cut down and drained the land lying next to the river, and had planted it in some crop requiring entirely a dry culture — such as corn or cotton. Would the defendant have a right to cut his dam and destroy the growing crop? For all legal purposes, the plaintiff might, under such circumstances, have regarded his land as though the water had never flowed through it."

In *Lakeside Paper Co.* v. *State (supra)* the Appellate Division, Third Department, cited with approval the *Belknap, Shepardson, Townsend* and *Mathewson Cases (supra)* as authority for the proposition that where the State had deepened the channel of the outlet of Skaneateles lake, and this changed condition had continued for upwards of twenty-four years, the altered channel must be regarded as the natural one, and that the Canal Board had no more right to obstruct or prevent the flow of water through it than the Board would have had if the channel had always existed in its deepened condition.

*Belknap* v. *Trimble* has been cited and followed many times by the various courts of this State, as late as 1914 (*Tracy Development Co.* v. *Becker*, 212 N. Y. 488), although, with the exception of the *Lakeside Paper Case (supra)*, not upon the point involved here. Its doctrine has never been overruled or criticised. I feel that a rule which has never been questioned since it was laid down in 1832, and which has been followed with approval by the Appellate Division in this State, and by the highest appellate courts in several other States, must be recognized as the law in this forum, and is binding on this court, notwithstanding the criticism of certain law professors and courts of other jurisdictions.

Defendants would have no rights here if they and their predecessors in title had not continuously impounded the surplus waters in the lake for twenty years or more, with notice to the riparian owners, and in hostility to their rights, and under a claim of right so to do, and if such riparian owners had not sat quietly by and acquiesced therein. What defendants and their predecessors in title gained by continued possession, plaintiffs and their predecessors in title lost by their laches and failure to object. The riparian owners were bound to know that if they sat idly by and permitted the owners of the dam to raise the level of the lake for twenty years or more, such permission would eventually ripen into

a right to continue such changed condition forever. They noted the maximum and the minimum height to which the lake was raised during all these years. They evidently concluded that they were not damaged if the lake was not raised too high, and if the fluctuation in the level of the water did not vary too much. Had they been given to understand that the defendants were acquiring rights to maintain the present levels of the lake, they might, and evidently would, have thought otherwise, and would have asserted their rights and put an end to the appropriation of this surplus water by the owners of the dam.

Defendants urge that if the doctrine of reciprocal rights be maintained they can never abandon their easement, but must forever maintain the dam at the outlet·for the benefit of the plaintiffs and their grantees. That question is not here. Plaintiffs are not seeking to surrender the rights which they gained during the prescriptive period, nor to abandon the dam. If the time should ever come when the power company should wish to relinquish its rights to the surplus waters in Lake Bonaparte, without doubt it would have a legal right to abandon its easement, notwithstanding the rights acquired by the plaintiffs. The company would not be permitted to willfully destroy the dam, but if that structure should become out of repair and ineffectual to maintain the level of the lake to a sufficient height to satisfy plaintiffs' easement, plaintiffs would have a legal right to enter upon defendants' lands and repair or restore the dam, as the case might require. (*Trustees of Southampton* v. *Jessup*, 162 N. Y. 122, 129; *Huntington* v. *Asher*, 96 id. 604, 612; *Roberts* v. *Roberts*, 55 id. 275, 277.)

Defendants urge that plaintiffs cannot acquire any right by prescription to keep water impounded in the lake for boating, bathing or fishing. That is true. A prescriptive right cannot be claimed in what is common to all. (*Commonwealth Water Co.* v. *Brunner*, 175 App. Div. 153.)

But plaintiffs can acquire a right to have the water along the line of their own property maintained at its legal height, where an infringement of such right would inure to their damage.

The right of a court of equity to. grant relief in a case of this character cannot be doubted. It is the duty of equity to safeguard the rights of the plaintiffs and not require them to institute an action at law from day to day to recover the damages they have sustained. (*Whalen* v. *Union Bag & Paper Co.*, 208 N. Y. 1; *McKee* v. *D. & H. C. Co.*, 125 id. 353; *Mudge* v. *Salisbury*, 110 id. 413; *Corning* v. *Troy Iron & Nail Factory*, 40 id. 191.)

I think that the evidence warrants a finding that during the prescriptive period the minimum level, with the exception of the

times when the dam was out or repairs were being made to it, and with possibly one or two other exceptions, was maintained at a point not lower than thirty inches below the crest of the old dam or twelve inches below the top of the new structure. There was apparently a fluctuation of not more than a foot between high and low water. I think that those figures fix defendants' rights in the withdrawal of water from the lake.

One other question remains to be considered. The evidence of Lovina Park was taken by commission. When that evidence was about to be read defendants objected to the entire testimony upon the ground that the witness was mentally incompetent. It appears that in 1927, in proceedings duly instituted for that purpose, Mrs. Park was declared incompetent to manage her affairs, and Frank Bowman was appointed committee of her person and property. Just what the nature of her malady was does not appear. Whether her incompetency was due to a weakened mental condition or to a deranged mind, we are not told. From a reading of her testimony she certainly seems to have been a bright woman, possessed of a good memory, and to have been entirely rational.

Although a person may be insane, and confined in an asylum, he may still be called as a witness upon the trial of an action, provided his malady has not deprived him of his memory, or his ability to comprehend the facts concerning which he is called upon to testify, or to understand the nature of an oath. (*Reg.* v. *Hill,* 5 Eng. L. & Eq. 547; *McCutchen* v. *Pigue,* 4 Heisk. [51 Tenn.] 565.)

In *Odell* v. *Buck* (21 Wend. 142) it was held that, in the absence of fraud, imposition or undue influence, mere weakness of mind or unsoundness to some extent is not sufficient to avoid a contract. If that be true, such mental deficiency would not be sufficient to prevent the person thus afflicted from testifying in an action.

A person may be incompetent to manage his affairs because of some peculiar weakness of mind, and yet his memory or ability to recall past events may be in no way affected. A man may be a lunatic, in the common acceptation of the term, simply because of some special delusion or an impulse to do some particular thing, while his other mental faculties may show little or no signs of degeneration. Persons whose minds are slightly weak or deranged in certain ways may need treatment. They may be incompetent to transact business, and yet their memory of and ability to relate past events may be as good as ever, and they may be perfectly competent to talk intelligently concerning any ordinary subject, and to give their version of a transaction which happened many years

before. I do not think that there is anything here which makes Mrs. Park incompetent to testify. While the court did not have the advantage of seeing the witness, her testimony and the manner in which she answered the questions propounded show her to have been a bright and intelligent old lady, possessed of a memory far better than many a person of her age. The fact that some years ago she had been declared incompetent to manage her affairs goes to the weight which should be given to her testimony, but does not make it wholly incompetent. I reserved my decision upon the objection of defendants' counsel, because in the haste of the trial the evidence of this witness was not actually read. I now overrule Mr. Burns' objection and give him an exception.

If I am right in the foregoing conclusion, the plaintiffs are entitled to judgment restraining the defendants from raising the level of the water in Lake Bonaparte to a height higher than the level of the new dam constructed in 1920, or from drawing the water down to a level lower than twelve inches below the crest of the same dam. The record being devoid of any evidence showing the extent of plaintiffs' damage by reason of the unlawful acts of the defendants, no damages are awarded. Plaintiffs are entitled to costs.

Prepare findings and send to me for my signature.